**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

---

ADVANCED PLUS LLC, ADVANCED
PLUS DEAL 1 LLC, and ADVANCED PLUS
DEAL 2 LLC and PACTOLUS INCOME
OPPORTUNITIES LLC,

        *Plaintiffs,*

        v.

LANDON JORDAN, NATIONAL
INDIVIDUAL INSURANCE AGENCY,
LLC, BLACKHAWK CLAIMS SERVICE,
INC., STRATEGIC LIMITED PARTNERS
LP, RFA GROUP, INC., THE HEALTH
SHARE GROUP INC., ASSOCIATION
HEALTH CARE MANAGEMENT, INC.,
CRIMSON HOLDING GROUP, INC.,
RIDGE ADMINISTRATIVE SERVICES,
INC., CHRISTOPHER JAMES
PAGNANELLI, ROY FRANKLIN
ANDING, JR., RAMI HASSAN, MARK
KECK, DAVID KEELER and HAROLD L.
BROCK, Jr.,

        *Defendants.*

Case No. 1:24-cv-8881

**COMPLAINT and DEMAND FOR
JURY TRIAL**

---

Plaintiffs Advanced Plus LLC, Advanced Plus Deal 1 LLC, Advanced Plus Deal 2

LLC and Pactolus Income Opportunities LLC (collectively "Plaintiffs"), complain

against Defendants Landon Jordan, National Individual Insurance Agency, LLC,

Blackhawk Claims Service, Inc., Strategic Limited Partners LP, RFA Group, Inc., The

Health Share Group Inc., Association Health Care Management, Inc., Crimson Holding

Group, Inc., Ridge Administrative Services, Inc. (collectively, "Jordan's Entities" or the

"Jordan Entities"), C.J. Pagnanelli, Roy Franklin Anding, Jr., Rami Hassan, Mark Keck, David Keeler and Harold L. Brock, Jr. (collectively, "Jordan's Cronies" or the "Jordan Cronies"), as follows:

## SUMMARY OF THE ACTION

1.      Plaintiffs Pactolus Income Opportunities LLC ("PIO"), as senior secured lender and attorney in fact of Advanced Plus LLC, Advanced Plus Deal 1 LLC and Advanced Plus Deal 2 LLC ("AP"), file this action to end the systematic, nationwide, ongoing insurance scam being perpetrated by Landon Jordan ("Jordan"), his sham Entities and the Cronies that he controls. Plaintiffs' case is not the first to accuse Jordan of operating a fraudulent business.

2.      This suit mimics the damning findings made by Hon. Jose E. Martinez, a federal judge in the U.S. District Court for the Southern District of Florida ("Florida Action"), who described Jordan's entire business as a "pump and dump" scam. Following a bench trial, Judge Martinez found, in a fifty-four page Decision, that Jordan's scam began with a "kickback deal" between Jordan and C.J. Pagnanelli ("Pagnanelli"), the CEO of a secured lender with whom Jordan was doing business. Jordan promised Pagnanelli a 20% ownership stake in one of Jordan's Entities, called American Workers Insurance Service, Inc. ("AWIS"), and a portion of the marketing fees generated by AWIS—the proceeds of which Jordan had paid to Pagnanelli's personal bank account—in exchange for Pagnanelli's agreement to funnel over $30

million of the lender's money into AWIS.[1] The Court found that the siphoning of such large amounts of money to a sham entity constituted the beginning of the "pump" portion of the scam.

3.    Originally, the money in the Florida Action had been funded by the lender to advance insurance agent commissions, creating a future revenue stream. Insurance agents earn a commission on each insurance policy sold. Typically, insurance agents do not receive their commissions until policyholders pay their policy premiums over time, usually monthly. Jordan, his Entities and Cronies, solicit funds from lenders to retain their insurance agents by advancing several months of future commissions earned by the insurance agents. The insurance agents are thrilled to sell their commissions in order to be paid immediately. The lenders advanced a future revenue stream, which are repaid by the insurance agents at a premium.

4.    The business, managed properly, would have been extremely lucrative to all parties involved. Defendants' intentional mismanagement of the business and unfettered greed prevented any such result.

5.    In the Florida Action, once the kickback scam had been exposed and Pagnanelli removed as CEO of the lender, the lender's parent company attempted to "right-size the investment." Meaning, because so much money had been put at risk in

---

[1] Only a few of the names of the Jordan Entities are referred to in this action because Jordan and his Cronies have so many entities in place to execute this scam that it is impossible to know the universe of them until there is extensive discovery. As demonstrated below, the entities are all controlled by Jordan or one of his Cronies.

3

an alleged future revenue stream, it was essential for efforts to be made to collect as much of it from the agents as quickly as possible.

6.      Jordan was not going to let that happen. Jordan, his Entities and Cronies had taken millions in improper fees and used the lender's money to pay kickbacks to the insurance agents. Preventing any proper accounting of his sham Entities' books and records, Jordan then executed the beginning of the "dump" part of the scam. Jordan and AWIS refused to repay the lender, transferred all existing policies into the name of another Jordan sham entity, began doing business in the new entity's name and bankrupted AWIS. The bankruptcy, marking the final step in Jordan's "dump" scheme, is almost certain to repeat itself here.

7.      While the lender in the Florida Action ultimately recouped a significant amount of its investment, Judge Martinez concluded that at least $8 million remained missing. Pagnanelli was held liable for the $8 million. On information and belief, Jordan settled with the lender before trial.

8.      Judge Martinez also found that as the successor to the bankrupt Jordan Entity, AWIS, Jordan's National Individual Insurance Agency, LLC ("NIIA"), "essentially replaced" AWIS, including its ongoing business and sought a new lender to fund the existing and future insurance agent commission revenue stream. Specifically, Judge Martinez found that the new iteration of AWIS, NIIA, entered into a new lending agreement with Plaintiff AP. PIO and AP, in turn, entered into a Senior Loan and Security Agreement to fund the deal, already tainted by Jordan. As Judge Martinez found: "NIIA was the 'contingency plan' for AWIS's 'pump and dump'." Discovery in

4

this action will reveal whether funds received from Plaintiffs were used to repay the lender in the Florida Action, as Plaintiffs suspect.

9.      The findings of fact and conclusions of law in the Florida action that first uncovered Jordan's fraud is a roadmap to the claims asserted in this action because Jordan repeats the same "pump and dump" scam here. Not less than $22 million in money advanced by Plaintiffs to what Judge Martinez found to be Jordan's "shell" company NIIA, remains unpaid to Plaintiffs by Jordan, his Entities and his Cronies. In short, Defendants are engaged in a second iteration of the same civil conspiracy to defraud lenders that they executed in the Florda Action.

10.     In May 2023, AP defaulted on its $32 million obligation to PIO primarily because all $32 million in capital had been deployed to Jordan, Jordan's Entities and Cronies — and had not been repaid to Plaintiffs by Defendants.[2] AP and PIO began working together to unravel this scheme, with PIO leading direct discussions with Jordan, his Entities and Cronies to salvage as much of this investment as possible.

11.     At first, Defendants were satisfied to deal with PIO because they presumed that PIO would be willing to pour millions more into the business. Defendants miscalculated. While Plaintiffs were willing to allow Defendants to recycle some of the commissions and fees owed to Plaintiffs by the insurance agents from prior advances, PIO absolutely refused to come out of pocket any further.

---

[2] Additional unsecured funding was provided by Velocity Group USA Inc. through merchant cash advances and there were AP member loans to fund the deal.

12.     In fact, the only reasons PIO even agreed to negotiate with Defendants at all, is because: (1) Defendants started repaying PIO, presumably from portions of the insurance policy revenue streams; and (2) Defendants promised to make their books and records available to determine where PIO's money was spent, what remained owed and how it would be repaid. To this day, Defendants have stymied, delayed and obfuscated every effort by PIO to achieve its goal of transparency into Defendants' books and records. It is for this reason, too, Defendants were never going to resolve this dispute.

13.     Throughout their dealings, Jordan offered to give personal guarantees to resolve this dispute only later to refuse to disclose proof of funds sufficient to prove solvency. Jordan also made repeated misrepresentations about buying out Plaintiffs with newly raised funds from other investors—capital that never materialized.

14.     In the end, Jordan proved to be a huckster who controls some insurance agents—not a legitimate businessman. Jordan owns significant land, racehorses and fast cars, none of which legitimizes him or makes him honest.

15.     As one example of the depths to which Jordan will sink, Plaintiff has learned that Jordan had advanced millions of Plaintiffs' funds to agents through a third-party administrator controlled by Jordan, not known to Plaintiffs and not a counterparty to any agreement with Plaintiffs. Jordan also used Plaintiffs' funds to advance insurance agent commissions from agents with limited documentation, including unsigned and incomplete contracts, or no agreements at all.

16.     In response to learning of Jordan's cartel-like behavior, in December 2023, PIO made it known to Defendants that it would no longer advance funds against any further insurance agent commissions.

17.     Emboldened by having successfully effectuated this scam in Florida, Jordan took the position that because there are no contracts with certain of his third-party administrators and the insurance agents Jordan controls who received Plaintiffs funds—Plaintiffs are left without *any* recourse. When confronted with the blueprint of Jordan's wrongdoing that is the Florida decision, Defendants doubled down.

18.     Defendants took the position that signed contracts that did exist were unenforceable and Jordan's advancing PIO's funds in the absence of contracts was Defendants' "lesson learned" from the Florida case that Defendants boasted ensured their victory here. Defendants presumed a Court would endorse Defendants' license to steal PIO's money because of *Defendants'* intentional mismanagement of it.

19.     Even in the absence of *any* contract, the law is not so forgiving of fraud, conversion, breach of fiduciary duty, unfair competition, unjust enrichment, civil conspiracy, fraudulent transfers, an accounting, and other related causes of action.

20.     As Plaintiffs have learned and Defendants concede, Jordan commingles his personal finances with his business accounts because he sees no distinction between them. The books and records of the Jordan Entities are intentionally sloppy and indecipherable. These admissions by Defendants to Plaintiffs resulted in the firing of Defendants' former CFO. A new CFO was hired in April 2024. But the new CFO could not, and still cannot reconcile the books and records to this day because Defendants did

7

not observe corporate formalities, did not properly account for the advances, commingled funds, created false accounts, paid kickbacks to insurance agents to keep them under Defendants' control and ceased all payments to Plaintiffs in May 2024.

21.    By charging fees for marketing, oversight and administration of the entire revenue stream, in addition to advancing the agents' commissions, Jordan, his Entities and Cronies had access to over $300 million through the recycling of Plaintiffs' capital. Defendants intentionally are not able to account for the funds advanced, repaid or distributed, leaving a morass on Defendants' books and records. Plaintiffs are owed not less than $22 million by Defendants, a number that is sure to increase with a proper independent audit of all of Jordan's businesses.  Plaintiffs move for an immediate accounting of Jordan, Jordan's Entities and Cronies.

22.    No corporate formalities are ever followed by Jordan, Jordan's Entities and his Cronies. As detailed below, a robust evidentiary record exists to pierce the corporate veil of all of Jordan's Entities and his Cronies.

23.    To resolve any doubt about who is in control and at the center of this scam, within the last few weeks, as Defendants have been creating outright false accounting to artificially reduce the amount owed to Plaintiffs, Jordan's Chief Operating Officer, Michael Sullivan, could not dispute Plaintiffs' accounting, which was backed up by hard data. By contrast, Defendants' numbers are, by their own admission, unsupportable and have been disproven by Plaintiffs' extensive analysis. So much so that Sullivan recently agreed to pay Plaintiffs roughly $500,000. At Jordan's instruction, payment was not made. Instead, Defendants' unsubstantiated financial claims persist.

8

24.    Plaintiffs have devoted over one year to trying to reach a deal to prevent this action. The more Plaintiffs met with Jordan—and learned about his deceptive business practices—the more important it became to file this action to stop him from perpetrating his "pump and dump" scam here, or ever again. Plaintiffs seek not less than $22 million and will seek exemplary damages against all jointly and severally liable Defendants.

## Jordan's and his Entities' Kickback and Pump & Dump Scheme



THE PARTIES

25.    Plaintiff PIO is a Delaware limited liability company, a party to the PIO-AP Agreement, a first priority secured creditor of AP, and the holder of a First Prioirty Promissory Note executed by AP in the amount of roughly $32 million. PIO is a Delaware limited liability company whose members are Virginia residents.

26.     Plaintiffs AP, Advanced Plus Deal 1, LLC and Advanced Plus Deal 2, LLC are New York limited liability companies and parties to the Agreement with PIO. Today, PIO has a power of attorney over all AP entities, for the purpose of collecting on the debt at issue in this case. All AP entities' members are New York and Michigan residents.

27.     Defendant Landon Jordan is an individual who resides in Texas and is the mastermind of this insurance scam. Jordan owns or controls the Jordan Entities directly, or through the Jordan Cronies. Even a cursory investigation of Jordan reveals that Jordan is affiliated with at least twenty-nine different entities, some dormant others active depending on Jordan's needs.

28.     Defendant National Individual Insurance Agency, LLC, is, as described by Judge Martinez, "essentially a shell entity owned by Jordan" that was used to restart this insurance scam from NIIA's predecessor, AWIS. NIIA is a Texas limited liability company with its principal place of business at 1900 Matlock Rd., Ste. 500, Mansfield, TX, 76063-4439. Jordan, through a web of shell companies, owns NIIA.

29.     Defendant, Blackhawk Claims Service, Inc. is a Georgia corporation, controlled by Jordan, directly or indirectly, with its principal place of business at 4370 Peachtree Road, NE, First Floor, Atlanta, GA 30319-30319.

30.     Defendant, Strategic Limited Partners LP, is a Texas limited partnership controlled by Jordan, directly or indirectly, with its principal place of business at 1452 Hughes Road, Suite 200, Grapevine, TX 76051-76063.

31.     Defendant, RFA Group, Inc., the signatory for Strategic Limited Partners LP, is a Texas limited partnership controlled by Jordan, directly or indirectly, with its principal place of business at 2951 Marina Bay Drive, Suite 130-643, League City, TX 77573-2735.

32.     Defendant, Association Health Care Management, Inc., is a Texas corporation, controlled by Jordan, directly or indirectly, with its principal place of business at 11111 Richmond Ave., Suite 200, Houston, TX 77082-6602.

33.     Defendant, The Health Share Group, Inc. is a Texas Corporation, controlled by Jordan, directly or indirectly, with its principal place of business at 1900 Matlock Dr, Ste. 500, Mansfield, TX 76063.

34.     Defendant, Crimson Holding Group, Inc., is a Texas corporation controlled by Jordan, directly or indirectly, with its principal place of business at 610 Uptown Blvd., Ste. 2000, Cedar Hill, TX 75104-3528.

35.     Defendant, Ridge Administrative Services, Inc., is a Texas corporation controlled by Jordan, directly or indirectly, 1900 Matlock Rd., Ste. 500, Mansfield, TX, 76063-4439.

36.     Defendant, C.J. Pagnanelli, the former CEO of Insurety is an individual, working at the direction of Jordan, residing in Florida.

37.     Defendant, Roy Franklin Anding, Jr., CEO of RFA Group, Inc., is an individual, working at the direction of Jordan, residing in Texas.

38.     Defendant, Rami Hassan, is affiliated with Association Health Care Management, Inc., and is an individual working at the direction of Jordan, residing in

11

Texas. While not a named director of Association Health Care Management, Inc., Hassan held a senior executive role and had direct control over advances allocated to agents, agencies and by extension direct oversight over compliance and contractual obligations between the company and its affiliates.

39.     Defendant, Mark Keck, CEO of Blackhawk, is an individual working at the direction of Jordan, residing in Georgia.

40.     Defendant, David Keeler, is the CEO of Ridge Administrative Services, Inc., and is an individual working at the direction of Jordan, residing in Texas.

41.     Harold L. Brock, Jr., has held himself out as the President of NIIA, who has executed numerous documents on behalf of NIIA, and is an individual working at the direction of Jordan residing in Texas.

## JURISDICTION & VENUE

42.     This Court has jurisdiction over this matter under 28 U.S.C. § 1332(a)(1) because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000. Defendants all knew that Plaintiff AP, from whom all of the advanced funds were received by Defendants were New York entities. Defendants knew that their "pump and dump" scam would be directed at AP, in this jurisdiction.

43.     Venue is proper in the United States District Court for the Eastern District of New York under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or a substantial part of property that is the subject of the action giving rise to Plaintiffs' claims arose or is situated in this judicial district.

## FACTS

12

**The Liability in the Florida Action is the Roadmap for Plaintiffs' Claims in this Case**

44.     The Florida Action was tried to Judge Martinez from January 3, 2023, to January 5, 2023. On July 17, 2023, the Court issued its findings of fact and conclusions of law in a fifty-four-page opinion. *See* Exhibit 1 to this Complaint. What follows is a summary of the Court's findings and direct quotations exposing Jordan's, his Entities' and Cronies' scam.

45.     The Florida lawsuit was brought by a secured lender of Jordan's Entities called 777 Capital LLC ("777"), and 777's subsidiary, Insurety Capital LLC ("Insurety") against Insurety's former Chief Executive Officer, C.J. Pagnanelli. With money originating from 777 and passing through Insurety, short-term cash advances were made to independent marketing organizations and third-party administrators controlled by Jordan.[3] Jordan's independent marketing organizations serve as intermediaries between insurance carriers and "independent" insurance agents.[4]

46.     Insurance agents earn a commission on each insurance policy sold. Typically, insurance agents do not receive their commissions until policyholders pay their policy premiums, usually monthly. Jordan, his Entities and Cronies, solicit funds from lenders to satisfy and retain their insurance agents by advancing against months of future commissions earned by the insurance agents up front and before the actual

---

[3] In addition, third party administrators of the insurance policies at issue in this case are predominantly controlled by Jordan.

[4] Calling these insurance agents "independent" is a misnomer. They work at the direction of Jordan, Jordan's Entities and Jordan's Cronies. In fact, because Jordan, his Entities and Cronies pay the insurance agents—Defendants control these agents.

premiums are received from the policyholders. In other words, Jordan's Entities take money from lenders to advance future revenue streams of insurance commissions from the insurance agents, who are happy to assign their commissions and fees, to be paid immediately.

47.     To induce the lenders to lend the money to Jordan's Entities, Jordan and Jordan's Cronies, often provide corporate and personal guarantees that they never intend to honor. Jordan and many of Jordan's Cronies hold themselves out as having significant personal assets as a result of operating this business.

48.     All things being equal, the advance of the insurance commissions result in a significant revenue stream for Jordan, his Entities and Cronies—and the lenders. When it comes to Jordan, his Entities and Cronies, however, all things are never equal.

49.     The Florida action centered around accusations by 777 of self-dealing by Pagnanelli, Insurety's CEO. The Court found Pagnanelli and Jordan conspired to defraud 777.

50.     More specifically, Judge Martinez found that in May and June 2018, Pagnanelli brokered a deal to fund two shell entities, ultimately owned through a web of shell companies by Jordan. One of these entities, AWIS, marketed the insurance agent revenue streams. The other entity Association Health Care Management, Inc. ("AHCM") managed the insurance products, acting as a third-party administrator.

Again, both entities are owned and controlled by Jordan. In fact, they are alter-egos of Jordan.[5]

51. The Court conclusively exposed the "kickback scheme" between Jordan and Pagnanelli. According to the Court findings, Jordan gave Pagnanelli a share of all fees earned by AWIS and a 20% personal ownership stake in AWIS. Pagnanelli concealed the kickback scheme with Jordan from Insurety and 777. Pagnanelli then used Insurety's money—over $30 million to fund AWIS—in violation of Pagnanelli's fiduciary duties owed to 777 and Insurety. In addition to being an explicit kickback from Jordan to Pagnanelli, funneling over $30 million into Jordan's AWIS Entity marks the "pump" part of the scam. As the Court held: "After the initial funding was provided, Defendant continued to direct Insurety's funding to AWIS in increasingly larger and riskier amounts in order to benefit himself personally, all while continuing to conceal his interest in AWIS."

52. When 777 learned about Pagnanelli's self-dealing with Jordan, 777 sought to negotiate a new relationship with AWIS to protect its long-term revenue stream. In other words, with over $30 million in AWIS, 777 and Insurety attempted to salvage the risky investment because a future revenue stream still existed.

---

[5] One notable example from the Florida Action is illustrative of Jordan's corporate shell game. The Court found that the Jordan Entities that were "pumped," "dumped" and bankrupted were AWIS and AHCM. According to the Court's finding in the Florida action, the ownership structure of AHCM and AWIS were as follows: "AHCM and AWIS are 100% owned by AHCM Holdings, LLC. AHCM Holdings, LLC is 100% owned by Rendon Group Management, LLC. Rendon Group Management, LLC is 100% owned by Landon Jordan."

15

53.    As the Court held: "Defendant intentionally interfered with that process by aiding in the creation of a new entity that would essentially replace AWIS, National Individual Insurance Agency, LLC ('NIIA').  All the while, Defendant was attempting to replace Insurety with a new advanced funder. . . NIIA was essentially a shell entity owned by Jordan that was used to step into AWIS's shoes." This action signals the beginning of the "dump" part of the scam, closing up shop with AWIS and simultaneously reopening it under NIIA, again both Jordan-controlled Entities.

54.    The Court further held that "NIIA itself admits that it was a shell entity used to step into AWIS's shoes in its Expedited Motion for Protective Order filed in this case. . . NIIA was the 'contingency plan' for AWIS's 'pump and dump.'" AP, using PIO's money, became the new investor in Jordan's shell entity, NIIA.

55.    The Court in Florida explicitly found that after Pagnanelli struggled to find a new lender, he used Insurety's trade secrets—detailed spreadsheets showing the performance of the deal absent the "pump and dump" scam—to induce AP into the transactions at issue in this case. Judge Martinez found that Jordan and Pagnanelli then successfully secured funding "for NIIA through Advance Plus in November of 2019," before the Florida Action was filed.[6]

56.    Ultimately, Jordan's and Pagnanelli's AWIS was the subject of a temporary restraining order because AWIS refused to repay Insurety as the agents

---

[6] The financial model used to induce AP into the deal originated with Pagnanelli. Metadata shows that the model was created by Pagnanelli on August 9, 2016, and last modified by Pagnanelli on September 17, 2019, just before it was provided to Plaintiffs as an introduction to the investment.

repaid the commissions to AWIS. In fact, AWIS was held in contempt of Court for violating the TRO. On the eve of the second contempt hearing AWIS filed for bankruptcy, completing the "dump" part of the scam. Or, as the Florida Court found: Insurety "suffered extensive loss, because instead of working with Insurety to right size the risk profile, AWIS declared bankruptcy in an attempt to avoid repaying and has not paid Insurety back in full for the advance funding that Insurety provided under Defendant's influence and direction."[7]

57.    Even after AWIS emerged from bankruptcy, AWIS still owed Insurety $8 million. Yet, NIIA continued paying AWIS (and by definition Pagnanelli) ahead of Insurety. Defendant in this action, Rusty Brock, a Jordan Cronie and Defendant here, "confirmed that he was responsible for calculating the referral payments from AWIS and NIIA to Defendant each month."

58.    The Florida Court also found that Pagnanelli, "in connection with Jordan and well within the one-year non-compete, tried to arrange financing with Producer Advance (a competitor of Insurety) for existing clients at AWIS and transfer them to NIIA." This attempt to secure funding failed.

59.    In awarding Insurety and 777 roughly $8 million in damages, the Florida Court described the conduct engaged in by Pagnanelli as a "fraudulent kickback scheme with AWIS and NIIA leading Insurety into the AWIS deal under false pretenses."

---

[7] Jordan also put AHCM into bankruptcy—and used different shell companies that he controlled to serve as the third-party administrator of the NIIA agent commission revenue stream.

17

60.    At all times relevant to this action, Jordan, his Entities and Cronies knew that PIO, like 777 before it, was the secured lender of the funds allocated to advance against insurance agent revenue streams by Jordan's shell company NIIA.

**The AP-PIO Relationship Was Compromised by Jordan, the Jordan Entities and the Jordan Cronies' Misconduct from the Outset**

61.    The AP-PIO Loan and Security Agreement, entered into on May 12, 2021, states as its purpose that AP, as borrower, and PIO as secured Lender, would "make loans to Borrower for business purposes, including funding the advancement against future commission receivables on supplemental health care policies."

62.    When AP, as borrower, brought this opportunity to PIO, PIO did not know and was not told: (a) Jordan's NIIA operated as a continuation of AWIS, which had defaulted on its repayment obligations to Insurety and 777 and filed for bankruptcy; (b) Jordan had been involved in a "kick back scam" with Insurety's CEO, Pagnanelli, and was engaged in a "pump and dump" scheme of his businesses; and (c) the due diligence materials used to induce Plaintiffs into this business were based on Insurety's trade secrets.

63.    On May 14, 2021, contemporaneous with the execution of the Agreement, AP signed a $15 million Secured Promissory Note in favor of PIO to fund virtually all of AP's business.  The interest on the Promissory Note was affixed at 12% annually.  By a separate Secured Promissory Note (incorporated by reference into the Agreement), PIO increased its funding commitment to $32 million. The maturity date of repayment of all principal and interest was May 14, 2023, two years after the Agreement was executed.

64.     As Jordan had done with Insurety, Jordan induced AP to fund all $32 million of PIO's money to Jordan's Entities, including NIIA, for purposes of advancing the insurance agent commission revenue streams.

65.     AP defaulted in May 2023, primarily because of Jordan, Jordan's Entities and Jordan's Cronie's failure to repay AP. After lengthy negotiations, PIO Managing Member, Pactolus Securities, LLC and its designated representative, Alan Harter ("Harter"), proposed to AP's principals the "immediate restructuring" of the business "involving the. . . necessary financial and operational controls to help alleviate the stress on the portfolio. . . ." In order to stabilize the portfolio, Harter proposed meeting directly with NIIA, to effectuate the slowdown of the number of new policies being advanced funds and added to the portfolio. Harter also proposed modifying the economic structure of the business to reflect PIO's larger role in trying to salvage the investment.

66.      With AP in breach and unable to pay, the parties negotiated a power of attorney, permitting PIO to take any action in AP's name to recover on the $32 million debt, including dealing directly with Jordan, Jordan's Entities and Jordan's Cronies. The power of attorney was signed in August 2023.

67.     Using the power of attorney, PIO, through AP, entered into a Confidentiality Agreement with NIIA, the Jordan Entity controlled by a Jordan Cronie, named Howard Brock. The AP-NIIA Mutual Confidentiality Agreement expired on August 30, 2024.

**Jordan Repeats the Pump and Dump Scam**

19

68.    Jordan, the Jordan Entities' and the Jordan Cronies' conduct in this case primarily tracks the "pump and dump" scheme in the findings made by Judge Martinez in the Florida Action. In this case, it is even worse.

69.    From the outset, Plaintiffs interaction with Jordan, the Jordan Entities and the Jordan Cronies has been an exercise in Defendants' obfuscation, delay and concealment. This fraud continues unabated. The purpose of the entire interaction with Plaintiffs from Defendants' perspective has been to ensure that Defendants' "pump and dump" strategy is not compromised.

70.    Even before the AP-PIO power of attorney was signed, Plaintiffs insisted that the accountants at BDO USA independently audit Jordan and the Jordan Entities. In April 2023, BDO actually was hired to do exactly that. But Jordan and the Jordan Entities stymied every effort by BDO to perform the audit.

71.    In reality, Jordan could not take the chance that his businesses would be audited by a professional auditor outside of Jordan's control. The civil conspiracy to defraud lenders between Jordan, Jordan's Entities and Jordan's Cronies would have been revealed. To this end, Defendants stopped the BDO audit dead in its tracks.

72.    In September 2023, Jordan, his Entities and Plaintiffs began negotiating a potential resolution of this dispute.[8] Plaintiffs earlier beliefs were confirmed through Jordan's executive Sullivan, that millions of Plaintiffs' money had been used to advance against insurance agent commissions at Jordan's direction, through another Jordan-

---

[8] The vast majority of the negotiations were principal to principal.

20

controlled Entity, called Strategic Limited Partners LP ("SLP"). Using Plaintiffs' money, Jordan caused these advances to be made to insurance agents—despite SLP's failure to enter into any formal contracts with AP. As Plaintiffs also later discovered, at Jordan's direction very few contracts were entered into between any Jordan Entity and the insurance agents whose commissions were being advanced.

73.     Meaning, money was advanced to insurance agents Jordan controlled without any accompanying paperwork or compliance oversight. The lack of a paper trail was intentional and meant to make it more difficult to track the flow of funds and collect the advances. This was Jordan's Florida scam on steroids.

74.     Once the lack of documentation was discovered, Plaintiffs insisted on papering these SLP advances, immediately. Jordan, his Entities and Cronies claimed to understand, and the parties jointly drafted agreements. Again, Jordan, his Entities and Cronies were feigning the need for agreements, as the "pump and dump" scam, they believed, is better served by having no agreements with those to whom Jordan sent Plaintiffs' money. To this day, approximately $10 million advanced to Jordan's SLP entity has not been repaid. Plaintiffs and SLP still do not have complete, signed agreements.

75.     Though it took two months for Jordan to disclose them, even the NIIA-AP agreements, as produced by Jordan to Plaintiffs—are bizarre. They are signed by Brock (a Jordan Crony), but they are in a Microsoft Word format. These agreements include a Master Commission Assignment Agreement and a Corporate Guaranty, requiring NIIA

to pay to AP in full any default by any insurance-agent (defined as "seller") of the repayment of any advanced commissions. The Corporate Guaranty reads:

> Guarantor hereby unconditionally guarantees to Buyer the full, complete, and punctual payment of all obligations of Seller related to any and all obligations owing by Seller to Buyer. If Seller fails to make full, complete and punctual payment of any amounts due under the Agreement or any other Agreement, the Guarantor hereby agrees to make such payments to Buyer immediately upon demand.

According to the metadata associated with these documents, the original author of them was the General Counsel for yet another of the Jordan Entities, AHCM, which as detailed above was put into bankruptcy by Jordan in the Florida lawsuit.[9]

76.    From August 2023 to today, Jordan and sometimes the Jordan Entities promised to guaranty certain amounts owed to Plaintiffs. Every time Plaintiffs have pressed for proof of assets sufficient to guaranty the amounts owed to Plaintiffs, Defendants have provided nothing.

77.    On November 1, 2023, Plaintiffs and Jordan, and his Entities exchanged a term sheet to attempt to resolve this dispute. It became clear that this was a delay tactic. Defendants had no intention of signing it. One sticking point had been that the Jordan Entities were in need of cash because "open enrollment," the time when insurance companies sell the most policies and the Jordan Entities advance the most commissions to the insurance agents, generally begins in November of each year.

---

[9] Again, there is no observation of corporate formalities among the Jordan Entities—and all roads lead to Jordan personally.

22

78.     At the time, and at various points since, Jordan had claimed to have lined up new financing to provide funds to get through open enrollment. Despite claiming to be on the verge of closing new investment money, Jordan, his Entities and Cronies never secured additional funding for the business. Sullivan confirms that to this day Defendants are unable to secure new funding.

79.     In fact, Jordan does not genuinely seek new investment until the "dump" phase of the scam, as he did with Insurety after transferring AWIS assets to NIIA.

80.     Instead, Jordan insisted on "recycling" some of the money owed to Plaintiffs to increase the future revenue stream, preserve the portfolio and protect the ability to collect funds already advanced to the agents. In theory, Plaintiffs had been unopposed to recycling some of the funds to get through open enrollment, provided that Jordan and his Entities signed a guaranty backed by proof of solvency. On numerous occasions, Jordan and his Entities claimed to be compiling proof of solvency for purposes of guaranteeing their debts to Plaintiffs. What takes less than an hour to produce—proof of solvency—always resulted in months of stonewalling by Jordan, his Entities and Cronies.

81.     Still, some recycling of Plaintiffs' funds did occur, especially during open enrollment because the Jordan Entities were paying down some of the debt owed to Plaintiffs, belatedly and in fits and starts. The reduction in the amount owed still must be verified by an independent auditor to confirm the accuracy of the repayments in Defendants' books and records. It was for this reason, too, that Plaintiffs continued

negotiating with Jordan, his Entities and his Cronies. Even as Jordan and his Entities made repayments, corporate formalities were never observed.[10]

82.     On December 11, 2023, however, Plaintiffs ceased all advances and demanded that all recycling end because of Defendants' refusal to produce evidence from Jordan or any Jordan Entity of their ability to satisfy any guaranty. Defendants also refused full transparency of any reconciliation of Defendants' books and records, which were incomplete and inaccurate—and remain so to this day.

83.     On December 13, 2023, counsel for Jordan and the Jordan Entities characterized Plaintiffs' decision to cease funding as contrary to some imprecise *obligation* to fund that did not exist. Without citing to any agreement obligating Plaintiffs to fund any Jordan Entity, counsel for Jordan and the Jordan Entities made a veiled threat to take some vague action unless Plaintiffs funded further advances, writing: "please allow this to serve as notice that my client will treat Advance Plus/Pactolus's decision to discontinue advances as final as of 5:00 pm CST today." Reading between the lines, Defendants were threatening to stop repaying Plaintiffs.

84.     In response to the nebulous threat from Defendants' counsel, on December 13, 2023, counsel for PIO, responded:

> . . . using AP's/PIO's money – with a guarantee from solvent entities or individuals among those that you represent -- your clients would only need to contribute or raise roughly $1.4 million to get through open enrollment. In fact, by working together, PIO has funded 100% since May 2023 and PIO had agreed to pay for roughly 83% of open enrollment, provided that its

---

[10] On December 15, 2023, for example, the Jordan entities made payment to AP with a wire memo that read, "from Blackhawk per Landon." Blackhawk is a Jordan-controlled third-party administrator, allegedly operated by Brock.

24

money was guaranteed.  During open enrollment, the other 17% needed to come directly from your clients in order to have skin in the game.  This equals a 93% guarantee of AP's/PIO's funding going back to May 2023. Your clients agreed to the accuracy of these numbers.

The email continued questioning Jordan and the Jordan Entities' commitment to providing any proof of the ability to satisfy a corporate guaranty. The email concluded: "It is our hope that when our clients speak at 11:30am this morning, cooler heads will prevail.  For now, understand that your email rightly was not well received by my clients."

85.    Plaintiffs did not fund. Defendants took no immediate action.

86.    This back-and-forth culminated in counsel for Jordan and the Jordan Entities brazenly attempting to use the mismanagement of this business by Jordan to cajole Plaintiffs into further funding. Admitting that Jordan and his Entities and Cronies had failed to secure contracts with most of the underlying insurance agents, counsel for Jordan and his Entities suggested that Plaintiffs' failure to fund would leave Jordan and his Entities with absolutely no recourse against the insurance agents—further harming Plaintiffs' investment.

87.    This concession would be the first in a series of admissions that would be used by Jordan and his Entities to argue, nonsensically, that Plaintiffs have no rights against Jordan and his Entities because of the failure of *Jordan and his Entities* to secure written contracts and repayment mechanisms with the insurance agents that Jordan paid with Plaintiffs' money. Jordan and Jordan's Entities then expanded this argument,

25

making their position known that the existing agreements with Plaintiffs are, according to Defendants, unenforceable.

88.    In short, still owing Plaintiffs not less than $22 million, Jordan and his Entities claimed a license to steal Plaintiffs' money because of Jordan's intentional mismanagement of the business. The only explanation for such a brazenly incorrect interpretation of the law is that it was made by a man who is comfortable engaging in a "kickback" and "pump and dump" scam, as the findings in the Florida Action establish.

89.    In mid-December 2023, Jordan and the Jordan Entities explicitly threatened to stop paying Plaintiffs, in retaliation for the decision not to fund further advances.[11] Yet, ultimately even Defendants conceded that Plaintiffs had no obligation to fund the advances, contractual or otherwise.

90.    The threat to cease payment, however, ratchetted up the temperature between the parties. Plaintiffs raised the specter of the blueprint that is the Florida Action to explain Defendants' conduct. Jordan and his Entities responded by asserting that the Florida case "was never a suit against" Jordan or the Jordan Entities. It was a case, Defendants threatened, that they "learned from" so that "any potential similar litigation dispute would" result in a total victory for Jordan and his Entities. Remarkably, Defendants claimed to be boasting about honing their "pump and dump" and "kickback" prowess.

---

[11] Counsel for Jordan and his Entities have a practice of starting new email threads in response to all emails to eliminate context. This practice is designed to create confusion, mirroring Jordan's corporate governance practices.

26

91.     Plaintiffs responded on December 15, 2023, by pointing out the numerous brutal findings against Jordan in the Florida action, including at least one finding related to Plaintiffs. Judge Martinez's findings against Jordan bore repeating to Defendants, and included:

a.  "NIIA was essentially a shell entity owned by Jordan that was used to step into AWIS's shoes." (Ex. 1 at 15).

b.  "NIIA further admits that Defendant led the efforts to obtain a new commission advance partner. As Jami Guli ("Guli") testified, NIIA was the 'contingency plan' for AWIS's 'pump and dump.'"(*Id.* at 15).

c.  "Defendant, in connection with Jordan and well within the one-year non-compete, tried to arrange financing with Producer Advance (a competitor of Insurety) for existing clients at AWIS and transfer them to NIIA…." (*Id.* at 18)

d.  "After Financial Carrier Services also declined to do business with Defendant and Jordan, Defendant then reached out to Advance Plus (another competitor of Insurety) within the one year non-compete period in a last-ditch effort to establish and obtain funding for AWIS, which at this point had fully merged into NIIA." (*Id.* at 19)

92.     Plaintiffs further wrote to Defendants: "Even the most cursory review of your clients' business practices, e.g., instructing employees not to sign agreements" with insurance agents, while simultaneously advancing money to the insurance agents without contracts, and "thinking that this business practice gives your clients some

27

legal advantage" is irrational. Plaintiffs further asserted, this conduct rises "to the level of legal mismanagement of a business that could have dire consequences," such as the appointment of a receiver.

93.    Days later, in late December 2023, another skirmish broke out because Jordan and his Entities began breaking from the course and conduct of the parties in retaliation for Plaintiffs' decision to stop recycling the funding. Relying on what Defendants claimed were the absence of enforceable contracts, Defendants refused to pay $727,687.70 in repayments from the insurance agents, ceased sending any backup spreadsheets allegedly detailing the repayments of the insurance commissions owed, stopped making mid-month adjustment payments, refused view-only access into bank accounts and withheld all other data Defendants were contractually obligated to present to Plaintiffs.

94.    In response, Plaintiffs pointed out that Jordan's Entities had guaranteed these repayments, and they were due one way or another. Defendants claimed in response that none of the rights that the parties had been operating under were in any enforceable contract, the corporate guaranty was "limited" and the absence of a contract with SLP rendered Plaintiffs without any rights to recoup the roughly $10 million advanced to agents selling SLP products at Jordan's direction.[12] Defendants' response was petulant for the sake of petulance. Defendants were promising to make payment,

---

[12] Defendants' SLP argument depended on Jordan's Entities following strict corporate formalities — something that Jordan and his Entities never did.

28

just on a new timeline that was inconsistent with the parties' course of conduct and the contracts.

95.     This scrap died down because Defendants had misunderstood Plaintiffs' contemporaneous offer to resolve this entire dispute. The offer was reconveyed. Again, cooler heads briefly prevailed.

96.     On January 10, 2024, the parties signed a nonbinding Letter of Intent. The Letter of Intent outlined the need to button-down advances made in governing agreements to break the circularity of arguing about the nonexistence and enforceability of various contracts. After signing the Letter of Intent, Defendants made three marginal payments to Plaintiffs. Yet, to this day Defendants have failed to sign any new agreements.

97.     January through early April 2024 was dedicated to working on an Investment Agreement, Producer Agreement, Servicing Agreement and Guaranty Agreements. As long as Defendants continued repaying Plaintiffs, Plaintiffs believed a deal could be reached. Owing not less than $22 million, most of which could not even be reconciled by Defendants, Defendants never had any intention of settling this dispute.

98.     Consistently, negotiations took months and were highlighted by the insistence on a new Jordan shell Entity being introduced as a key entity under which the entire business would be moved. This ploy was identical to the Florida Action, which involved shutting down AWIS and moving the business to NIIA in Florida. This

time, Defendants proposed shutting down NIIA and moving all assets to Ridge Financial Services Inc. Defendants' "dump" of Plaintiffs' assets had begun.

99.    As part of this proposal, Defendants refused to present organizational and capitalization charts for Jordan's new entity and Defendants continued to refuse to produce evidence of solvency as part of the two guarantees. On April 15, 2024, Defendants failed to make a promised payment of $580,000 to Plaintiffs.

100.    Contemporaneously, Defendants claimed, for the first time, that they needed to recalculate their entire books and records prior to making further payments. It was Defendants' own accounting department, however, that claimed that it could not reconcile Defendants' books to prove exactly where all the money had been spent, what had been repaid and what was outstanding. Defendants' poor record keeping was intentional and succeeded in making it difficult, if not impossible, to track where Plaintiffs' money was sent.

101.    Jordan knew exactly what had happened to Plaintiffs' money. This conduct was more of Jordan's "dump" part of the plan.

102.    On April 19, 2024, Plaintiffs' counsel again conveyed the urgency of providing proof of solvency of the guarantors' ability to pay under the terms of the proposed guaranty. Again, no proof of solvency was presented by Jordan or any entity. In fact, Defendants had represented that there were two lines of Jordan's businesses that were profitable to the point of being able to satisfy the proposed guaranty. As Plaintiffs' counsel wrote: "Great, take the 15 minutes to prove it." Plaintiffs demanded that, "as a show of good faith, Jordan—or whichever Jordan entities you claim would be the

guarantors of the debts owed to my client—pay the roughly $580K by close of business on Monday, April 22."

103.    In response, Defendants maintained that they had fired the former CFO, who had admitted to paying Jordan's personal expenses out of his commingled business accounts.  Jordan brought in a new executive team, claiming the need for a proper accounting of the Jordan Entities' books and records. The new executive team started in late April 2024, immediately claiming to need more time because they could not make sense of the entire business. An internal, opaque "audit" ensued.

104.    In May 2024, Defendants made their last repayment to Plaintiffs. Defendants again used as an excuse that until the books and records were reconciled, payment would be withheld. Defendants knew the books and records of this business were unreconcilable, a fact later admitted by the new CFO.

105.    Though the entire business was mismanaged, the new CFO's concern was focused on the fact that defendant had advanced an amount in excess of $10 million, commencing in May 2023 and continuing to at least June of 2024, to third parties controlled by Jordan without the benefit of contracts or any knowledge that advances presented were legitimate.  Defendant directed their employees to continue making these advances despite the lack of any completed documentation or compliance oversight. It is unknown whether these funds were directed to Jordon, his Entities and Cronies directly or indirectly. Only an audit of Jordan's entire business will reveal where this $10 million was directed.

106.    Plaintiffs demanded an all-hands-on-deck, in person, meeting. Defendants claimed scheduling difficulties and the need for more time to allow the new CFO to do his work. The meeting did not get scheduled until June 17, 2024. Three days before the meeting, Defendants cancelled it. The meeting was then rescheduled to late July 2024.

107.    At the in-person meeting, held in Dallas in July 2024, the parties discussed every aspect of the business, set deadlines for the new CFO to finish his work and otherwise worked toward resolving the dispute. This too, had been a Jordan ruse.

108.    The deadlines discussed at the meeting, especially the deadline to complete the internal audit were not met. In fact, the audit allegedly is still ongoing.

109.    On November 11, 2024, Harter wrote to Sullivan and reiterated that: (a) the new CFO was "reviewing the transactions from the inception of the strategy;"; (b) " there is some inconsistency in the accounting, and it is yet to be determined if the advances were processed correctly;"; (c) "all funds were commingled" among all of the Jordan Entities "and that in part was one of the biggest challenges;" (d) all payments be made immediately and weekly because the "results of the exercise will not meaningfully change the amount presently owed;" and (e) "any long-term resolution of the unpaid debit balance owed to AP will need to be supported by a corporate and personal guarantee from Landon Jordan."

110.    This November 2024 email constituted Defendants' last chance. Defendants failed to comply, opting instead for the continued misconduct by Jordan, the Jordan Entities and the Jordan Cronies. Most recently, Defendants have claimed that their "recalculation" of Defendants' own books and records has reduced the

32

outstanding amounts owed to Plaintiffs. Numerous inconsistent arguments along these lines have been made to Plaintiffs by Defendants—with no supporting financial documentation to prove their assertion.

111.    Rather, Plaintiffs have disproven every argument asserted by Defendants, through Plaintiffs' own analysis. Most recently, Sullivan has agreed to Plaintiffs' math, agreeing to make a roughly $500,000 payment to Plaintiffs to reduce the outstanding amount owed. Jordan was never going to let this payment be made. Yet, nobody on Jordan's team has presented any quantitative evidence to disprove Plaintiff's math, presented to Defendants on December 11, 2024.

112.    Working with an independent third-party administrator of the insurance agent commissions advances—not completely controlled by Jordan—Plaintiffs exposed that over $828,000 that Jordan had said was paid by one of his entities, allegedly to cover shortfalls in advances as a result of PIO's refusal to fund, was falsely retained by Jordan. Had Plaintiffs not collaborated with this third-party administrator, it could only have relied on Defendants' books and records, which falsely show this $828,000 being paid to the third-party administrator with whom Plaintiffs collaborated.  In addition, PIO uncovered routine kickbacks being paid by Jordan and his Entities to the insurance agents. Again, only an audit will confirm if these practices by Defendants were systematic.

113.    It has been seven months since Defendants last made a payment to Plaintiffs. Plaintiffs are still owed not less than $22 million. Plaintiffs fully expect Defendants to execute the final "dump" portion of this scam. To the extent that any

Jordan Entities file for bankruptcy, this action should proceed against Jordan and any individual and entity that does not file for bankruptcy. Under applicable law, any bankruptcy stay does not apply to Plaintiffs' claims against the non-bankrupt Defendants.

114.    Plaintiffs are fully committed to ending this scam. This aim begins with a full accounting of all of Jordan's books and records. Plaintiffs immediately will move for an independent accounting of all Defendants' books and records.

## COUNT I: ACCOUNTING
### (Against Jordan and the Jordan Entities)

115.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

116.    Jordan and the Jordan Entities exercised exclusive control over Plaintiffs' specific, identifiable funds, including funds designated for advances to insurance agents. Plaintiffs reposed trust and confidence in Jordan and the Jordan Entities to manage these investments properly, thereby establishing a duty to act in Plaintiffs' best interests and to provide complete transparency regarding the administration of funds.

117.    Jordan and the Jordan Entities operated as alter egos of one another, with overlapping management, shared control, comingling of personal and business assets and disregard for corporate formalities. Jordan and the Jordan Entities utilized shell entities and individual actors to obscure the origin, use, and movement of funds. As such, Jordan and each of the Jordan Entities should be held jointly and severally liable for the acts of the others.

118.     Plaintiffs demanded an independent accounting of the funds from Jordan and the Jordan Entities in April 2023. However, Defendants refused to provide an accounting, refused to allow audits, deliberately obstructed efforts to review financial records, and concealed material financial information necessary for Plaintiffs to assess the disposition of their funds.

119.     At the same time, Defendants admit that they used Plaintiff's money without entering into contracts with third-party administrators and insurance agents. In fact, they are boastful about this gross mismanagement of Plaintiffs' funds.

120.     As a result of Jordan and the Jordan Entities' acceptance of the Plaintiffs' funds and their refusal to provide full and complete information, an accounting is the only means to ascertain the extent of the misconduct.

121.     Plaintiffs lack adequate remedies at law and require an accounting to ascertain the scope of Jordan and the Jordan Entities' misconduct and the proper disposition of Plaintiffs' funds.

122.     Plaintiffs seek an order requiring Jordan and the Jordan Entities to provide a full and complete accounting of all funds received from Plaintiffs, the disposition of those funds, and the current location of any remaining funds. Plaintiffs further seek costs, attorneys' fees, and any other relief the Court deems just and proper.

**COUNT II: FRAUD**
**(Against All Defendants)**

123.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

124. Defendants knowingly made affirmative misrepresentations and concealed facts regarding the solvency, legitimacy, and contractual underpinnings of the parties' transaction.

125. Specifically, from August 2023 to the present, Defendants misrepresented and concealed the following material facts from Plaintiffs:

   a. The true financial condition and solvency of the entities under their control;

   b. The legitimacy and enforceability of the agreements governing the advance against insurance commissions;

   c. The status of corporate guarantees allegedly supporting the repayment of funds;

   d. The existence and content of contracts with third-party agents to secure future revenue streams;

   e. The use and allocation of Plaintiffs' funds for unauthorized purposes;

   f. The concealment of internal control failures and lack of proper financial oversight;

   g. The concealment of related-party transactions that directly benefited Defendants and their affiliates;

   h. The concealment of the improper commingling and misuse of Plaintiffs' funds;

i.  The misrepresentation as to the accuracy and completeness of data, books records, spreadsheets and other financial information provided to Plaintiffs;

j.  The establishment and concealment of kickback and other illicit and illegal schemes and activities by and among the Defendants and the insurance agents/agents;

k.  The continued promises to make payment and rectify payment shortfalls with the intent to prevent Plaintiffs from ever fully receiving payment in full;

l.  Defendants were at all relevant times engaged in a "pump and dump" scheme as detailed by the Florda Action—and as repeated here.

126.    Defendants knew these misrepresentations and concealments were false and intended for Plaintiffs to rely on them to induce further investments and conceal Defendants' ability to repay Plaintiffs.

127.    Plaintiffs justifiably relied on Defendants' misrepresentations and concealments, believing the funds would be used properly to advance commission streams secured by enforceable agreements and guarantees—ultimately leading to repayment.

128.    As a result of Defendants' fraud, Plaintiffs suffered significant financial harm.

129.    All Defendants operated as alter egos of one another, using shared resources, overlapping leadership, and a coordinated scheme to execute the fraudulent

misrepresentations and concealments. Each Defendant's conduct was part of a unified, fraudulent scheme, and all should be jointly and severally liable.

130. Plaintiffs seek damages for all losses sustained as a result of Defendants' fraudulent conduct, including but not limited to, lost principal, lost profits, damages, and attorneys' fees. Plaintiffs further seek punitive damages to deter similar conduct, along with any other relief the Court deems just and proper.

## COUNT III: AIDING AND ABETTING FRAUD
### (Against All Defendants Not Liable for Fraud)

131. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

132. To the extent any Defendant is found not directly liable for fraud, such Defendant knowingly aided and abetted the fraudulent civil conspiracy scheme by actively participating in and substantially assisting with the fraudulent acts.

133. These Defendants had knowledge of the fraudulent scheme, actively participated in and facilitated its execution, and substantially assisted in actions that resulted in significant financial harm to Plaintiffs.

134. All Defendants operated as alter egos of one another, with interrelated control, shared decision-making, and misuse of corporate formalities. Their actions were coordinated to achieve a singular fraudulent scheme, warranting joint and several liability.

135. As a direct and proximate result of Defendants' aiding and abetting, Plaintiffs suffered significant financial harm.

136.    Plaintiffs seek damages from all Defendants found to have aided and abetted the fraudulent scheme. Plaintiffs further seek punitive damages to punish and deter such conduct, along with all costs, attorneys' fees, and any other relief the Court deems just and proper.

### COUNT IV: CONVERSION
### (Against Jordan and the Jordan Entities)

137.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

138.    Plaintiffs retained ownership rights to the specific, identifiable funds provided to Jordan and the Jordan Entities for the limited purpose of advancing and administering insurance commission streams. Plaintiffs' rights to these funds were specific, ascertainable, and distinct.

139.    Jordan and the Jordan Entities wrongfully exercised dominion and control over these funds, depriving Plaintiffs of access to the funds provided and using the funds for unauthorized purposes, including payments to affiliates, kickbacks to insurance agents and self-enrichment.

140.    Despite repeated demands for the return or proper accounting of the funds, Jordan and the Jordan Entities refused to return the funds and failed to account for their use.

141.    Jordan and the Jordan Entities acts of conversion were intentional, knowing, and in disregard of Plaintiffs' rights.

142.     Jordan and the Jordan Entities operated as alter egos of one another, with overlapping management, shared control, and disregard for corporate formalities. Jordan and the Jordan Entities utilized shell entities and individual actors to obscure the origin, use, and movement of funds. As such, Jordan and each of the Jordan Entities should be held jointly and severally liable for the acts of the others.

143.     As a direct and proximate result of Jordan and the Jordan Entities' wrongful conduct, Plaintiffs suffered damages, including but not limited to, the value of the converted funds, lost business opportunities, and other harm.

144.     Plaintiffs seek damages equal to the full value of the converted funds, as well as consequential damages, pre- and post-judgment interest, and attorneys' fees. Plaintiffs further seek punitive damages to deter similar conduct, along with any other relief the Court deems just and proper.

## COUNT V: BREACH OF FIDUCIARY DUTY
### (Against all Defendants)

145.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

146.     By exercising control over Plaintiffs' funds, Defendants entered into a relationship of trust and confidence, thereby creating fiduciary obligations to act in Plaintiffs' best interest, to exercise care, and to avoid self-dealing.

147.     Defendants breached their fiduciary duties to Plaintiffs by engaging in the following acts and omissions:

a.  Misappropriating Plaintiffs' funds for unauthorized purposes, including payments to affiliated entities, kickbacks to insurance agents and self-enrichment;

b.  Commingling funds;

c.  Failure to segregate and hold Plaintiff funds in trust as required under Blackhawk Servicing Agreement;

d.  Failing to disclose material facts related to the disposition and use of Plaintiffs' funds;

e.  Failing to properly account for the funds under their control despite repeated demands;

f.  Engaging in self-dealing by diverting funds for personal and affiliated use rather than for the benefit of Plaintiffs;

g.  Obstructing and refusing to permit audits of financial records, which would have revealed the misuse of funds;

h.  Absence of contractual agreements, corporate oversight, financial and operational controls and regulatory compliance;

i.  Failing to maintain proper oversight and internal controls to ensure Plaintiffs' funds were used for proper purposes and that Plaintiffs were repaid the amounts owed;

j.  Failure to maintain complete and accurate financial records in order to track and record Plaintiffs funds, ensure Plaintiffs funds were used properly;

k.  Creating illicit and illegal kickback and other schemes to incentivize third parties such as the insurance agents/agents to continue providing commission income streams to Defendants with no intention of paying Plaintiffs back the amounts rightfully owed;

l.  At all relevant times engaging in a "pump and dump" scheme as detailed by the Florda Action—and as repeated here.

148.  Defendants' conduct was knowing, intentional, and in bad faith, with a willful disregard for their obligations as fiduciaries.

149.  Defendants' shared control over financial decisions and disregard for corporate separateness render each Defendant liable as an alter ego. Each Defendant's breach of fiduciary duty was part of a coordinated scheme involving shared control, misuse of funds, and failure to act in Plaintiffs' best interests.

150.  As a direct and proximate result of these breaches, Plaintiffs suffered damages, including but not limited to, the loss of funds, lost business opportunities, and other financial harm.

151.  Plaintiffs seek damages for all losses resulting from Defendants' breach of fiduciary duty, including but not limited to, the loss of principal, lost profits, consequential damages, and attorneys' fees. Plaintiffs further seek disgorgement of any profits improperly obtained by Defendants and such other relief as the Court deems just and proper.

**COUNT VI: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Against All Defendants Not Liable for Breach of Fiduciary Duty)**

42

152.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

153.    To the extent any Defendant is found not directly liable for breach of fiduciary duty, that Defendant knowingly aided and abetted the breaches.

154.    Defendants knowingly provided substantial assistance to the principal wrongdoers, concealing the breach and enabling the ongoing misappropriation of funds.

155.    Defendants operated as alter egos of each other, enabling and supporting each other's breach of fiduciary duties. Their shared control and disregard for corporate separateness warrant holding all Defendants jointly and severally liable.

156.    Plaintiffs suffered damages as a result of Defendants' aiding and abetting.

157.    Plaintiffs seek damages from Defendants found to have aided and abetted the breach of fiduciary duty. Plaintiffs further seek punitive damages, disgorgement of profits obtained as a result of the breaches, attorneys' fees, and any other relief the Court deems just and proper.

### COUNT VII: UNFAIR TRADE PRACTICES
### (Against All Defendants)

158.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

159.     Pursuant to N.Y. Gen. Bus. Law § 349, "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this

state are hereby declared unlawful." Defendants' deceptive acts included, but were not limited to:

    a.  Representing that contracts with third-party agents existed and were enforceable, when in fact such contracts were either non-existent, incomplete, or unenforceable;

    b.  Misleading Plaintiffs regarding the solvency and financial condition of Defendants and their affiliated entities;

    c.  Failing to disclose material facts about related-party transactions and the diversion of funds to affiliated entities for unauthorized purposes;

    d.  Withholding financial records and obstructing Plaintiffs' attempts to obtain an independent audit of Defendants' operations;

    e.  Providing false assurances regarding the security and repayment of Plaintiffs' investments.

160.    These deceptive acts and practices were consumer-oriented in that they had the potential to impact not only Plaintiffs, but also other similarly situated investors and business partners, insurers and the insureds. Defendants' conduct was not limited to a private dispute but was part of a broader business practice involving multiple parties.

161.    As a result of Defendants' deceptive acts and practices, Plaintiffs suffered damages, including the loss of their funds, lost investment opportunities, and other financial harm.

162.    All Defendants acted as alter egos, using shared control to execute deceptive practices. Each Defendant's acts were part of a unified scheme of misrepresentation and concealment, warranting joint and several liability.

163.    Plaintiffs seek damages for all economic harm suffered as a result of Defendants' deceptive acts and practices. Plaintiffs further seek to prevent Defendants from engaging in further deceptive acts, attorneys' fees, and any other relief the Court deems just and proper.

## COUNT VIII: UNJUST ENRICHMENT
### (Against All Defendants)

164.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

165.    Defendants were unjustly enriched at Plaintiffs' expense by retaining funds without providing the expected services, benefits, or obligations owed to Plaintiffs.

166.    Plaintiffs conferred substantial financial benefits on Defendants, including the provision of funds intended for advancement and administration of insurance commission streams, which Defendants instead diverted for their own benefit.

167.    Defendants knowingly accepted and retained these benefits despite having no entitlement to them, and they failed to perform the services or fulfill the obligations associated with the funds.

168.    Defendants' retention of these funds was unjust, as it provided Defendants with an unfair financial windfall at Plaintiffs' expense.

45

169.    Equity and good conscience require that Defendants disgorge the funds to Plaintiffs, as allowing Defendants to retain these benefits would be inequitable and unjust under the circumstances.

170.    Defendants consistently have maintained that all contracts between the parties are unenforceable.

171.    All Defendants operated as alter egos of one another, using shared control, overlapping management, and disregard for corporate formalities to retain and benefit from the funds unjustly. As such, each Defendant should be held jointly and severally liable for unjust enrichment.

172.    Plaintiffs seek restitution of all funds unjustly retained by Defendants, including any profits or benefits Defendants obtained from the use of such funds. Plaintiffs further seek attorneys' fees, costs, and any other relief the Court deems just and proper.

### COUNT IX: IN THE ALTERNATIVE BREACH OF CONTRACT
### (Against Jordan and the Jordan Entities)

173.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

174.    To the extent any tort or equitable claim asserted herein fails, Jordan and the Jordan Entities are liable for breach of contract in the alternative.

175.    A valid and enforceable agreement existed between AP and PIO, known as the AP-PIO Agreement.

176. Jordan and his entities were third-party beneficiaries of the AP-PIO Agreement, as the Agreement was intended to confer direct benefits on them, including the provision of substantial financial support and the opportunity to participate in and benefit from the advance and administration of insurance commission streams using Plaintiffs' money.

177. Plaintiffs fully performed their obligations under the AP-PIO Agreement, including advancing substantial funds to be used for the specific purpose of advancing commission streams and enabling Defendants to operate their business.

178. Plaintiffs fulfilled all conditions precedent necessary to trigger Defendants' performance obligations.

179. As third-party beneficiaries, Defendants were obligated to comply with the terms and conditions of the AP-PIO Agreement, including but not limited to obligations to ensure timely repayment of funds and to use the funds for the intended purpose of advancing insurance commission streams.

180. Defendants breached their obligations as third-party beneficiaries by failing to fulfill their contractual obligations, including but not limited to:

    a. Failing to repay the amounts due under the AP-PIO Agreement;

    b. Failing to properly administer and safeguard the insurance commission streams advanced with Plaintiffs' funds;

    c. Misusing and diverting funds for unauthorized purposes, including payments made to affiliated entities and personal enrichment;

    d.  Failing to maintain accurate records of the use of funds and refusing to provide a proper accounting of the transactions.

181.    All Defendants operated as alter egos of one another, sharing control, overlapping leadership, and disregarding corporate formalities. Their combined actions breached the AP-PIO Agreement, and as alter egos, they should be held jointly and severally liable for these breaches.

182.    As a direct and proximate result of Defendants' breach of the AP-PIO Agreement as third-party beneficiaries, Plaintiffs have suffered damages, including the loss of the funds advanced, lost business opportunities, and other consequential damages.

183.    Plaintiffs seek damages for all financial losses resulting from Defendants' breach of the AP-PIO Agreement, including but not limited to, lost principal, interest, consequential damages, and attorneys' fees. Plaintiffs further seek specific performance of Defendants' obligations under the contract, along with any other relief the Court deems just and proper.

### COUNT X: IN THE ALTERNATIVE BREACH OF CONTRACT
**(Against Jordan and the Jordan Entities)**

184.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

185.    To the extent any tort or equitable claim asserted herein fails, Jordan and Jordan's Entities are liable for breach of contract.

186.    A valid and enforceable contract existed directly between Plaintiffs and Jordan and the Jordan Entities, which governed the advancement, administration, and repayment of insurance commission streams. This included, but was not limited to, guarantees directly executed by Jordan, his Entities and Cronies.

187.    Implied contracts exist between Plaintiffs and any Jordan Entity that used Plaintiffs' funds, including, at a minimum SLP.

188.    Plaintiffs fully performed their obligations under these contracts, including providing substantial financial support and advancing funds to Jordan and the Jordan Entities to facilitate the advancement and administration of insurance commission streams. Plaintiffs fulfilled all conditions precedent necessary to trigger Defendants' performance obligations.

189.    Defendants breached their obligations under these direct contracts by failing to fulfill their contractual obligations, including but not limited to:

a.   Failing to repay the amounts due under the contracts, including principal and interest;

b.   Failing to properly administer and safeguard the insurance commission streams advanced against with Plaintiffs' funds;

c.   Misusing and diverting funds for unauthorized purposes, including payments to affiliated entities and personal enrichment;

d.   Failing to maintain accurate records of the use of funds and refusing to provide a proper accounting of the transactions.

    e.   failing to allow Plaintiffs full access to Defendants books and records and failing to allow an independent auditor to review and audit Defendants' books and records.

190. All Defendants operated as alter egos of one another, sharing control, intermingling funds, and disregarding corporate formalities. These Defendants are jointly and severally liable for the breaches of contract, as each Defendant's actions contributed to and facilitated the contractual violations.

191. As a direct and proximate result of Defendants' breach of these direct contracts, Plaintiffs have suffered damages, including the loss of the funds advanced, lost business opportunities, and other damages.

192. Plaintiffs seek damages for all financial losses resulting from Defendants' breach of their direct contracts with Plaintiffs, including but not limited to, lost principal, interest, consequential damages, and attorneys' fees. Plaintiffs further seek specific performance of Defendants' obligations under the contracts, along with any other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

1. At to Count One, an immediate independent accounting of all of Defendants' books and records to identify the use of Plaintiffs' funds.

2. As to Count Two, an Order awarding Plaintiffs compensatory, consequential, and punitive damages in an amount to be determined at trial.

3. As to Count Three, an Order awarding Plaintiffs compensatory, consequential, and punitive damages in an amount to be determined at trial.

4. As to Count Four, an Order awarding Plaintiffs compensatory, consequential, and punitive damages in an amount to be determined at trial.

5. As to Count Five, an Order awarding Plaintiffs compensatory, consequential, and punitive damages in an amount to be determined at trial.

6. As to Count Six, an Order awarding Plaintiffs compensatory, consequential, and punitive damages in an amount to be determined at trial.

7. As to Count Seven, an Order awarding requiring Defendants to return all funds wrongfully obtained or unjustly retained, including disgorging any profits derived from such funds.

8. As to Count Eight, an Order awarding Plaintiffs compensatory, consequential, and punitive damages in an amount to be determined at trial.

9. At to Count Nine, in the alternative an Order awarding Plaintiffs compensatory and damages in an amount to be determined at trial.

10. As to Count Ten, in the alternative an Order awarding Plaintiffs compensatory and damages in an amount to be determined at trial.

11. As to all Counts, an order awarding Plaintiffs pre- and post-judgment interest as allowed by law.

12. As to all applicable Counts, an Order awarding Plaintiffs all legal fees, expenses, and costs incurred in connection with this action.

13. As to all applicable Counts, an Order declaring that Plaintiffs are entitled to recover the funds at issue and that Defendants' conduct violated applicable law.

14. Granting such other and further relief as the Court deems just, proper, and equitable.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims for relief and issues triable by jury.

Dated: New York, New York
December 28, 2024

**ROBINS KAPLAN LLP**

By: s/*Gabriel Brerg*
Gabriel Berg
GBerg@RobinsKaplan.com
1325 Avenue of the Americas, Suite 2601
New York, New York 10019
Telephone:  212.980.7400

*Attorneys for Plaintiff PIO*

Klestadt Winters Jureller Southard & Stevens, LLP

By: s/*Sean Southard*
Sean Southard
SSouthard@Klestadt.com
200 West 41st Street, 17th Floor
New York, NY 10036
Telephone:  212.972.3000

*Attorneys for Plaintiffs AP*