**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

ADVANCED PLUS LLC, ADVANCED PLUS DEAL 1 LLC, ADVANCED PLUS DEAL 2 LLC, and PACTOLUS INCOME OPPORTUNITIES LLC,

*Plaintiffs*,

v.

LANDON JORDAN, NATIONAL INDIVIDUAL INSURANCE AGENCY, LLC, BLACKHAWK CLAIMS SERVICE, INC., STRATEGIC LIMITED PARTNERS LP, RFA GROUP, INC., THE HEALTH SHARE GROUP INC., ASSOCIATION HEALTH CARE MANAGEMENT, INC., CRIMSON HOLDING GROUP, INC., RIDGE ADMINISTRATIVE SERVICES, INC., CHRISTOPHER JAMES PAGNANELLI, ROY FRANKLIN ANDING, JR., RAMI HASSAN, MARK KECK, DAVID KEELER, and HAROLD L. BROCK, Jr.,

*Defendants*.

Case No. 24-cv-08881

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION TO FREEZE CERTAIN ASSETS AND TO ENJOIN CERTAIN DEFENDANTS FROM PREVENTING AN ACCOUNTING PURSUANT TO FED. R. CIV. P. 65**

## TABLE OF CONTENTS


INTRODUCTION ........ 1

FACTS ........ 3

1. Background and History of Jordan and His Entities' Fraudulent Schemes ........ 3
2. Jordan and His Entities' Persistent Refusal to Allow Transparency and Accountability ........ 6

LEGAL STANDARD ........ 9

ARGUMENT ........ 11

1. Plaintiffs' Equitable Claims Are Likely to Succeed on the Merits ........ 11
   a. Plaintiffs' Accounting Claim Is Likely to Succeed on the Merits ........ 11
   b. Plaintiffs' Unjust Enrichment Claim Is Likely to Succeed on the Merits ........ 14
2. Plaintiffs Will Be Irreparably Harmed Without Injunctive Relief ........ 15
3. The Balance of Hardships Strongly Favors Plaintiffs ........ 17
4. The Public Interest Strongly Favors Injunctive Relief ........ 18

CONCLUSION ........ 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*777 Partners LLC v. Pagnanelli*,
2023 WL 11965485 (S.D. Fla. July 17, 2023) .......... 5, 16

*3M Co. v. CovCare, Inc.*,
537 F. Supp. 3d 385 (E.D.N.Y. 2021) .......... 9, 15

*Adelphia Communications Corp. v. Rigas*,
2003 WL 21297258 (S.D.N.Y. June 4, 2003) .......... 10

*Allstate Ins. Co. v. Mun*,
751 F.3d 94 (2d Cir. 2014) .......... 18

*Charette v. Town of Oyster Bay*,
159 F.3d 749 (2d Cir. 1998) .......... 10

*Coley v. Vannguard Urb. Improvement Ass'n, Inc.*,
2016 WL 7217641 (E.D.N.Y. Dec. 13, 2016) .......... 10

*Doctor's Assocs., Inc. v. Stuart*,
85 F.3d 975 (2d Cir. 1996) .......... 18

*Dong v. Miller*,
2018 WL 1445573 (E.D.N.Y. Mar. 23, 2018) .......... 10

*Eichenblatt v. Kugel*,
2018 WL 3202079 (E.D.N.Y. May 15, 2018) .......... 12

*Fleet Dev. Ventures, LLC v. Brisker*,
2006 WL 3254480 (D. Conn. Sept. 15, 2006) .......... 11

*Golden Pac. Bancorp v. FDIC*,
273 F.3d 509 (2d Cir. 2001) .......... 14

*Gucci America, Inc. v. Weixing Li*,
768 F.3d 122 (2d Cir. 2014) .......... 10

*J.B.I. Indus., Inc. v. Suchde*,
2000 WL 1174997 (S.D.N.Y. Aug. 17, 2000) .......... 11

*Kleeberg v. Eber*,
331 F.R.D. 302 (S.D.N.Y. 2019) .......... 12

*Meisels v. Meisels*,
630 F. Supp. 3d 400 (E.D.N.Y. 2022) .......... 18

*Order Granting Temporary Injunction, Insurety Capital, LLC v. AWIS, Inc.*,
No. 2019-53545 (Tex. Dist. Ct. Aug. 7, 2019) .......... 4

*Salameno v. Rawlings*,
2021 WL 1085521 (S.D.N.Y. Mar. 22, 2021) .......... 13

*Sang Lan v. Time Warner, Inc.*,
2014 WL 764250 (S.D.N.Y. Feb. 25, 2014) .......... 12

*Se. Farms, Inc. v. Martens Fresh, LLC*,
2023 WL 2447752 (N.D.N.Y. Jan. 31, 2023) .......... 9

*SEC v. Bremont*,
954 F.Supp. 726 (S.D.N.Y.1997) .......... 11

*Shamrock Power Sales, LLC v. Scherer*,
2016 WL 6102370 (S.D.N.Y. Oct. 18, 2016) .......... 10

*Suber v. VVP Servs.*,
2021 WL 1101235 (S.D.N.Y. Mar. 23, 2021) .......... 18

*Titan Coverage Protection, LLC v. Jordan et al.*,
Case No. 2022-44561 (Tex. Dist. Ct. July 25, 2022) .......... 5

*Zohar v. LaRock*,
185 A.D.3d 987 (2d Dep't 2020) .......... 13

**Rules**

CPLR § 302 .......... 11

Federal Rules of Civil Procedure 65 .......... 1, 9, 10, 18

Plaintiffs Pactolus Income Opportunities LLC ("PIO"), Advanced Plus LLC ("AP"), Advanced Plus Deal 1 LLC, and Advanced Plus Deal 2 LLC (collectively, "Plaintiffs"), by and through their undersigned counsel, respectfully submit this motion for: (1) a temporary restraining order and preliminary injunction ("TRO/PI") freezing the repayments received by Jordan and his Entities[1] from insurance agents; and (2) an order prohibiting Jordan and his Entities from preventing an independent accounting of all funds they receive. Plaintiffs bring this motion pursuant to Federal Rule of Civil Procedure 65 and state as follows:

## INTRODUCTION

A TRO/PI and an independent accounting in this case are not just warranted—they are essential to uncover the full extent of Jordan and his Entities' brazen and fraudulent misconduct before the financial trail is lost entirely. Plaintiffs entrusted over $32 million to Jordan and his Entities with the understanding that these funds would be managed responsibly to finance insurance commission advances. Instead, Jordan and his Entities betrayed this trust by misappropriating funds, commingling these funds with Jordan's personal assets, and concealing this financial mismanagement through the use of a myriad of affiliated corporate entities. Without a TRO/PI to freeze the relevant revenue streams and an immediate accounting, Plaintiffs risk being permanently unable to trace their funds.

[1] "Jordan and his Entities" include Defendants Landon Jordan ("Jordan"), National Individual Insurance Agency, LLC ("NIIA"), Association Health Care Management, Inc. ("AHCM"), Blackhawk Claims Service, Inc. ("BCS"), Strategic Limited Partners LP ("SLS"), RFA Group, Inc. ("RFA"), The Health Share Group Inc. ("HSG"), Crimson Holding Group, Inc. ("CHG"), and Ridge Administrative Services, Inc. ("RAS").

This case is not an isolated incident but a near carbon copy of the Texas (and later Florida) actions where Jordan and his Entities' misconduct—including their brazen disregard for court orders—was laid bare in damning judicial findings. In the first case, a Texas court found certain of the Jordan Entities in contempt for deliberately violating a temporary restraining order and for refusing to provide financial transparency. Later, in the Florida action, Judge Martinez of the Southern District of Florida exposed Jordan's systematic use of shell entities, misappropriation of funds, and deliberate obfuscation to defraud creditors.

The parallels here are undeniable: once again, Jordan and his Entities have executed a "pump and dump" scheme, diverting entrusted funds and forming various corporate entities to obfuscate the fraud and shield assets from recovery. Seemingly emboldened by their ability to evade consequences in the past, Jordan and his Entities have blocked audits, refused transparency, and flaunted their bad faith. They have even boasted that they have further refined and perfected their fraud scheme since the Texas and Florida Actions. Plaintiffs should not—and cannot—be left to suffer the same fate as the Texas and Florida plaintiffs.

For over a year, Pactolus associate David Chandik worked closely with Defendants—and despite their obfuscation and refusal to provide complete information—Mr. Chandik uncovered significant financial irregularities as detailed in his affidavit (and exhibits). *See* Affidavit of David Chandik. It is now clear that an asset freeze on the relevant revenue streams and an independent accounting is the only available method to pierce the veil of deceit. For months, Defendants have actively

obstructed every effort to bring clarity to their financial dealings, blocking access to records and admitting to "inconsistencies" in the accounting while refusing to provide accurate data. Their actions reveal a calculated strategy to delay, deflect, and ultimately dissipate the funds before they can be recovered. This Court must intervene to compel transparency and prevent further harm. Time is of the essence; without immediate action, Plaintiffs face irreparable harm as Jordan and his Entities complete the final phase of their scheme, leaving a trail of hidden assets and shattered trust in their wake.

## FACTS

### 1. Background and History of Jordan and His Entities' Fraudulent Schemes

As described in its Complaint in detail—which is expressly incorporated herein by reference—Defendants, led by Landon Jordan, have for years been orchestrating fraudulent schemes involving the purchase and financing of insurance commission advances. Complaint at ¶44-60; *see also* discussion *infra*. In 2021, Plaintiffs entrusted Jordan and his Entities with over $32 million to fund the purchase of health insurance commission streams. Complaint at ¶61-114. As all parties understood, the funds were earmarked to purchase insurance commission streams, which were expected to yield steady returns. *Id.* at ¶61-65. Instead of properly managing and investing these funds as contemplated by the parties, Jordan and his Entities commingled and diverted the money for personal and unauthorized purposes, creating a façade of profitability, while concealing financial mismanagement and shielding the fact that they were not effectively securing, contracting, and tracing the disbursement of these funds to third parties. *Id.* at ¶61-114.

This is far from the first time Jordan and his Entities have defrauded investors. In 2019, Insurety Capital LLC—like the Plaintiffs here, a company that advanced funds to Jordan's Entities—filed a lawsuit and motion for Temporary Restraining Order ("TRO") against Jordan's companies—AWIS, and AHCM. *See Plaintiffs' Complaint, Insurety Capital, LLC v. American Workers Insurance Services*, Inc., No. 2019-53545, (Tex. Dist. Ct. Aug. 5, 2019). The lawsuit alleged, similar to the present case, that Jordan and his Entities failed to remit over $20 million owed to Insurety under agreements for advancing insurance commissions. Instead, Jordan and his Entities allegedly diverted these funds for unauthorized purposes. *Id.*

On August 7, 2019, a Texas court granted the TRO enjoining Jordan and his Entities from misusing Insurety's assets in violation of their agreements, which required monthly payments on certain collectibles, and to provide financial information. *See Order Granting Temporary Injunction, Insurety Capital, LLC v. American Workers Insurance Services*, *Inc.*, No. 2019-53545 (Tex. Dist. Ct. Aug. 7, 2019) (Berg Aff. Ex. 1).

Predictably, Jordan and his Entities refused to comply with the court order. On August 29, 2019, the Texas court found defendants in contempt, ruling that they had "knowingly and intentionally violated the terms of the Temporary Restraining Order" by failing to remit monthly collections, refusing to provide required reports, and obstructing Insurety's inspection rights. *Insurety Capital, LLC v. American Workers Insurance Services, Inc.*, No. 2019-53545 (Tex. Dist. Ct. Aug. 29, 2019) (Berg Aff. Ex. 2). The contempt order did little to deter Jordan and his Entities. As a Florida court later found, "Even then, AWIS refused to remit payment to Insurety . . . On the eve of a

second contempt hearing, AWIS filed for bankruptcy." *777 Partners LLC v. Pagnanelli*, 2023 WL 11965485, at *9 (S.D. Fla. July 17, 2023).

After Jordan voluntarily placed AWIS and AHCM into bankruptcy, Insurety and its parent company, 777 Partners, sued Christopher Pagnanelli, a former Insurety CEO, alleging breaches of fiduciary duties and misuse of confidential information to aid Jordan's schemes. *Id.* In that action, Judge Martinez found that Jordan systematically misappropriated funds, concealed financial transactions, and used shell entities, including NIIA and AWIS, to defraud creditors and evade accountability. *Id.* Clearly, Jordan and his Entities' repeated misconduct—including their refusal to comply with court-ordered obligations—represents a deliberate pattern of bad faith and fraudulent intent.[2]

Plaintiffs in this action have, unfortunately, fallen victim to a near-identical scheme. Over $32 million of Plaintiffs' funds were entrusted to Jordan and his Entities to finance insurance commission advances, but Jordan and his Entities have intentionally commingled, misappropriated, and concealed these funds. Complaint at ¶68-114. This case is yet another glaring example of Jordan and his Entities' calculated schemes where funds are siphoned off under the guise of legitimate investments, leaving behind a tangled web of mismanagement, deception, and financial ruin.

---

[2] Jordan and his Entities' misconduct extends beyond the Texas and Florida actions. Defendants Jordan, Hassan, NIIA, and AHCM have also previously been sued for fraud and accounting mismanagement, among other things, by an insurance agency they worked with. *See* Complaint at ¶ 5.1-5.4, 6.15-6.22, 7.1-7.9, 7.27-7.34, *Titan Coverage Protection, LLC v. Jordan et al.*, Case No. 2022-44561 (Tex. Dist. Ct. July 25, 2022) (Attached as Berg Aff. Ex. 3).

### 2. Jordan and His Entities' Persistent Refusal to Allow Transparency and Accountability

Not only have Jordan and his Entities ceased repayments, but—much like the Texas court previously found—they have also obstructed access to critical financial information and rejected all attempts at an independent accounting. *Id.* at ¶ 70, 84. Plaintiffs now face imminent and irreparable harm as Jordan and his Entities remain in the final "dump" phase of their scheme.

Plaintiffs have made extensive and tireless efforts to uncover the truth behind Jordan and his Entities' financial dealings. From August 2023 until the initiation of this action, David Chandik, an associate at Pactolus, met regularly with Landon Jordan's employees, including Alex Hartelust (Senior Managing Director), Michael Sullivan (COO), Corey Hoffman (former CFO), and Sam Lin (current CFO), in attempts to reconcile the financial records. Chandik Affidavit at ¶5. During those calls, Mr. Chandik's primary goal was to reconcile the Jordan Entities' books and records to determine where the advances made by AP, that originated with PIO, had been spent, what remained owed, and how those sums would be repaid. *Id.* at ¶9.

During that time, Mr. Chandik took over 280 pages of contemporaneous notes of calls, meetings and emails regarding those meetings. *See* Chandik Affidavit at ¶6; Chandik Aff. Ex. 1-2 (excerpts from call notes). However, Mr. Chandik had been given "view only" access to a portion of the Jordan Entities' books and records. As this access was limited, Mr. Chandik never received complete access to the Jordan Entities' books

and records to determine if bank records supported the data that he was provided. *Id*. at ¶7.

The financial irregularities included in the Jordan Entities' books and records—most of which were admitted by Jordan's employees—are too numerous to detail in Mr. Chandik's Affidavit, which instead focuses on some of the most notable examples, supported by his contemporaneous notes. *Id*. at ¶8. Ultimately, however, Mr. Chandik was never provided sufficient data to determine where the relevant funds had gone. *Id*. at ¶9. In fact, Jordan's own employees admit, to this day, that the Jordan Entities' books and records are irreconcilable. *Id*.; Chandik Aff. Ex. 2 at 113 and 125.

From the outset, Jordan and his Entities failed to provide accurate financial documentation. Key financial records were either unavailable or had to be created from scratch, representing a deviation from standard business practices. *See* Chandik Aff. at ¶10; Chandik Aff. Ex. 2 at 1-2. For example, during an August 21, 2023, call, Mr. Hartelust and Mr. Hoffman could not account for payments made by insurance agents to specific business lines funded by Plaintiffs. Chandik Aff. at ¶11; Chandik Aff. Ex. 2 at 4.

Making matters worse, entire business lines that received advances lacked documentation, with some advances being made without contracts. Chandik Aff. at ¶12; Chandik Aff. Ex. 2 at 8. Attempts to reconcile Jordan and his Entities' advances—including one meeting where they admitted their reports to be "not aligned with funding processes"—proved futile, as Jordan and his Entities failed to provide accurate

or complete records despite repeated efforts. Chandik Aff. at ¶13; Chandik Aff. Ex. 2 at 9.

It is also evident that the Jordan Entities disregarded corporate formalities, commingling funds across accounts, including with Jordan's personal accounts. Chandik Aff. at ¶14. Plaintiffs repeatedly requested segregation of funds, but these requests were ignored. *Id.*; Chandik Aff. Ex. 3 at 1. On April 25, 2024, Mr. Sullivan himself acknowledged the issue of intermingled accounts while agreeing in principle to an independent audit, which ultimately was never conducted. Chandik Aff. at ¶15-16; Chandik Aff. Ex. 2 at 83-84.

Following revelations of commingling, Mr. Hoffman was replaced by Mr. Lin as CFO. Mr. Lin, brought in to address the financial disarray, admitted that Mr. Hoffman "handled things [in] ways he would not have." Chandik Aff. at ¶17-18; Chandik Aff. Ex. 2 at 113.

Despite over a year of efforts to reconcile debit balances, Jordan and his Entities failed to provide accurate records. Chandik Aff. at ¶19; Chandik Aff. Ex. 3 at 2. Plaintiffs identified at least $1 million in discrepancies, with approximately $22 million still owed to PIO. Chandik Aff. at ¶21. Mr. Chandik estimates that from July to December of 2024, $6.5 million was repaid by brokers but not remitted to Plaintiffs. Chandik Aff. at ¶22. Further, Premier Health Solutions LLC ("PHS")—an independent third-party administrator—identified $828,000 in remittances unaccounted for in Jordan's records, with requests for supporting documentation ignored. Chandik Aff. ¶23; Chandik Aff. Ex. 2 at 205.

It is clear that without immediate judicial intervention and an independent accounting—like the unfortunate plaintiffs in the Texas and Florida actions—Plaintiffs will be left chasing assets fraudulently transferred or hidden by Jordan and his Entities with the financial trail becoming irreversibly hard to track, rendering any future recovery impossible. Chandik Aff. ¶ 24. In contrast, requiring an accounting would impose minimal burden on Jordan and his Entities and is consistent with their legal obligations to act transparently. Jordan and his Entities' refusal to comply with obligations underscores the need for this Court to swiftly order an asset freeze and accounting to prevent irreparable harm.

## LEGAL STANDARD

To obtain a TRO or PI under Fed. R. Civ. P. 65, the movant must establish "(1) a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *3M Co. v. CovCare, Inc.*, 537 F. Supp. 3d 385, 395 (E.D.N.Y. 2021) (internal citations and quotations omitted) (cleaned up); *see also Se. Farms, Inc. v. Martens Fresh, LLC*, 2023 WL 2447752, at *2 (N.D.N.Y. Jan. 31, 2023) ("It is well established that in [the Second] Circuit the standard for an entry of a TRO is the same as for a preliminary injunction.") (internal citations and quotations omitted) (cleaned up). It is also clear that an evidentiary hearing is not required prior to issuing preliminary injunction when "the disputed facts

are amenable to complete resolution on a paper record." *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998).

Applying these factors, courts have recognized that where a plaintiff seeks equitable remedies, including an accounting—as is the case here—asset-freezing preliminary injunctions are appropriate to preserve and ensure the availability of assets for equitable relief. *See, e.g., Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 130-133 (2d Cir. 2014) (ruling that asset-freezing preliminary injunction was available because the plaintiffs had sought an accounting, an equitable remedy); *Dong v. Miller*, 2018 WL 1445573, at *8 (E.D.N.Y. Mar. 23, 2018) (granting a asset freeze preliminary injunction under Rule 65 and ruling that "many courts have held [that] where plaintiffs seek <u>both</u> equitable and legal relief in relation to specific funds, a court retains its equitable power to freeze assets.") (cleaned up) (emphasis in original); *Coley v. Vannguard Urb. Improvement Ass'n, Inc.*, 2016 WL 7217641, at *2 (E.D.N.Y. Dec. 13, 2016) ("Federal courts . . . maintain the equitable power to issue an asset freeze . . . where the plaintiff is pursuing a claim for final equitable relief. ......") (cleaned up); *Adelphia Communications Corp. v. Rigas*, 2003 WL 21297258, at *5 (S.D.N.Y. June 4, 2003) (preliminary injunction freezing defendant's assets can be based on plaintiff's claims for accounting); *Shamrock Power Sales, LLC v. Scherer*, 2016 WL 6102370, at *4 (S.D.N.Y. Oct. 18, 2016) (similar).

Similarly, courts in the Second Circuit routinely grant preliminary injunctions for an accounting when issued in conjunction with an asset freeze, as is the case here. *See, e.g.*, *Fleet Dev. Ventures, LLC v. Brisker*, 2006 WL 3254480, at *3, *7 (D. Conn. Sept. 15, 2006) (granting preliminary injunction, finding "a likelihood of success on the merits on

its claim for an accounting," and ordering defendant to produce "any and all documents in his possession, custody or control concerning or related to the company or its assets . . ."); *J.B.I. Indus., Inc. v. Suchde*, 2000 WL 1174997, at *5 (S.D.N.Y. Aug. 17, 2000) ("By Order dated March 31, 2000, the Court granted plaintiff's application for an attachment and an accounting and denied defendant's cross-motion to dismiss[.]"); *SEC v. Bremont*, 954 F.Supp. 726, 733 (S.D.N.Y.1997) (having determined that a preliminary injunction should be issued, accounting was appropriate).[3]

## ARGUMENT

### 1. Plaintiffs' Equitable Claims Are Likely to Succeed on the Merits

#### a. Plaintiffs' Accounting Claim Is Likely to Succeed on the Merits

To succeed on the merits for an accounting claim under New York law, "plaintiff must show: (1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal." *Eichenblatt v. Kugel*, 2018 WL 3202079, at *7 (E.D.N.Y. May 15, 2018) (internal citations and quotations omitted).

---

[3] Having directed its fraudulent financial activities within the Eastern District of New York, jurisdiction is also proper under New York's long arm statute. *See* CPLR § 302 ("[A] court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent" "transacts any business within the state"; or "commits a tortious act within the state"; or "commits a tortious act without the state causing injury to person or property within the state . . . [and] . . . regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state . . . [and] . . . expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.").

Plaintiffs easily satisfy the first and second elements of their accounting claim. As Plaintiffs' Complaint makes clear, Plaintiffs entrusted Jordan and his Entities with $32 million, thereby establishing a relationship of a mutual and confidential nature, leaving Plaintiffs dependent on Jordan and his Entities to manage and invest its funds properly. Complaint at ¶61-114, 116, 146. Jordan and his Entities willingly accepted these funds and did so as a result of their representations to Plaintiffs that the funds would be used for the purchase of insurance commission revenue streams that would result in a return on investment for the Plaintiffs. *Id.* at ¶44-60. This entrustment gave Jordan and his Entities complete control, which increased their power while simultaneously limiting Plaintiffs' ability to protect their own interests. *Id.* By accepting this control, Jordan and his Entities created a fiduciary relationship of trust and confidence, obligating them to act in Plaintiffs' best interests, exercise care, and avoid self-dealing. *See Sang Lan v. Time Warner, Inc.*, 2014 WL 764250, at *4 (S.D.N.Y. Feb. 25, 2014) ("The fiduciary relationship necessary to obtain an accounting is created by the plaintiff entrusting to the defendant some money or property with respect to which the defendant is bound to reveal his dealings."). These allegations are more than sufficient to establish the first and second elements of Plaintiffs' accounting claim. *See Kleeberg v. Eber*, 331 F.R.D. 302, 322 (S.D.N.Y. 2019) (plaintiffs satisfied elements of accounting "by alleging that . . . (1) they were in a fiduciary relationship with Defendants; (2) they trusted Defendants to manage the Trust [and other assets]; and (3) they now have reason to believe that Defendants abused their fiduciary relationship with Plaintiffs to enrich themselves, and

Plaintiffs will be unable to uncover the extent of Defendants' purported fraud without an accounting.").

Having established a confidential and fiduciary relationship between Plaintiffs and Jordan and his Entities, Plaintiffs also satisfy the third factor—no adequate legal remedy. As New York courts have held, "where . . . there is a fiduciary relationship between the parties, there is an absolute right to an accounting notwithstanding the existence of an adequate remedy at law." *Zohar v. LaRock*, 185 A.D.3d 987, 991 (2d Dep't 2020); *see also Salameno v. Rawlings*, 2021 WL 1085521, at *21 (S.D.N.Y. Mar. 22, 2021) ("Even though plaintiff may have a legal remedy, she is not precluded from seeking equitable relief by way of an accounting predicated upon the existence of a fiduciary relationship.") (internal citations and quotations omitted). Moreover, Jordan and his Entities have consistently maintained that there are no operative contracts between the parties or that the contracts were unenforceable, a position that undermines the possibility of resolving these disputes through traditional legal remedies alone. Complaint at ¶170.

Finally, the fourth factor—a demand for an accounting and a refusal—also weighs heavily in favor of Plaintiffs. As Plaintiffs' Complaint (and Mr. Chandik's Affidavit) makes clear, beginning in April 2023, Plaintiffs demanded transparency and an independent audit, which Jordan and his Entities "stymied" and ultimately "stopped dead in its tracks" to conceal their financial mismanagement. Complaint at ¶70-71, 118. Despite further demands for financial records and proof of solvency, Jordan and his Entities obstructed every effort, admitting to "inconsistency in the accounting" and that

"all funds were commingled" while refusing to provide accurate data. *Id.* at ¶109. And as explained above, Mr. Chandik's affidavit provides detailed accounts of Jordan and his Entities' refusal to provide an accounting. *See* discussion *supra,* Fact Section 2.

Given Jordan and his Entities' clear obligations to Plaintiffs, their exclusive control over Plaintiffs' funds, and their persistent refusal to provide an accounting despite repeated demands, Plaintiffs' accounting claim is highly likely to succeed.

b. Plaintiffs' Unjust Enrichment Claim Is Likely to Succeed on the Merits

Plaintiffs' unjust enrichment claim—another equitable claim—is also likely to succeed on the merits. Under New York law, an unjust enrichment claim requires the plaintiff to demonstrate: "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 519 (2d Cir. 2001).

First, Jordan and his Entities were clearly enriched. Plaintiffs entrusted over $32 million to Jordan and his Entities with the expectation that the funds would be responsibly invested in insurance commission revenue streams. Complaint at ¶44-60. Instead, Jordan and his Entities misappropriated these funds, commingled them with personal accounts, and used them for unauthorized purposes as evidenced by their own admissions. *Id.* at ¶68-114; Chandik Aff. at ¶15.

Second, this enrichment was at Plaintiffs' direct expense. Plaintiffs have been deprived of the use and benefit of their funds, while Jordan and his Entities exploited

this trust for personal financial gain. There is simply no dispute that the enrichment came entirely at Plaintiffs' expense.

Third, equity and good conscience require the return of these funds. Jordan and his Entities' actions in Texas, Florida, and the current case—including their misrepresentation, obstruction, and refusal to provide transparency—demonstrate bad faith and a calculated scheme to profit at Plaintiffs' expense.

Plaintiffs have demonstrated a likelihood on the merits with respect to their equitable accounting and unjust enrichment claims. At a minimum, Plaintiffs have raised "serious questions going to the merits" and, as explained below, demonstrated that the balance of hardships tips decidedly in their favor. This showing is also sufficient to satisfy the first factor for a preliminary injunction. *See 3M Co*, 537 F. Supp. 3d at 395 (first factor of preliminary injunction satisfied by *either* "(1) a likelihood of success on the merits" *or* (2) "sufficiently serious questions going to the merits," along with a favorable balance of hardships).

**2. Plaintiffs Will Be Irreparably Harmed Without Injunctive Relief**

Plaintiffs face imminent and irreparable harm without an immediate TRO/PI and accounting. Like they did in the Texas and Florida Actions, Jordan and his Entities are actively dissipating assets as part of their "pump and dump" scheme. Complaint at ¶9, 69. In the Texas action, the court found Jordan and his Entities in contempt for failing to comply with a court order intended to identity and preserve the relevant funds. *See* discussion *supra,* Fact Section 1. Judge Martinez in the Florida Action specifically found that Jordan's shell entity, NIIA, was a continuation of AWIS,

designed to evade obligations and facilitate fraud. Complaint at ¶ 55, 91(a)-(d). Jordan and his Entities have learned from this prior case, boasting that they are now better equipped to avoid liability. *Id.* at ¶90. This is coupled with Jordan and his Entities' demonstrated willingness to sacrifice certain corporate entities to bankruptcy while simultaneously creating new ones to perpetuate their fraudulent schemes. *See 777 Partners LLC,* 2023 WL 11965485.

Here, Jordan and his Entities are in the final "dump" phase of their scheme. Without an immediate asset freeze and accounting, Jordan and his Entities will complete the dissipation of Plaintiffs' funds, leaving Plaintiffs chasing assets that have been fraudulently transferred or hidden. Jordan and his Entities' own accountants admit their books and records are unreconcilable with "inconsistencies in the accounting" and "commingling" of funds among entities. Complaint at ¶20, 104, 109. This deliberate obfuscation has already rendered it extremely difficult to track where Plaintiffs' money has gone—any further delay could render the task impossible.

Further, Plaintiffs refrained from filing suit earlier based on assurances from Jordan and his Entities that repayments would be forthcoming. However, Jordan unilaterally shut down this effort, undermining any possibility of resolution. This bad-faith conduct underscores the urgency for immediate judicial intervention as Plaintiffs now anticipate a bankruptcy filing by one or more of Jordan and his Entities, a hallmark tactic of Jordan's schemes *Id.* at ¶113. Time is of the essence to uncover the location and use of Plaintiffs' funds before they are further dissipated, rendering any future recovery futile.

### 3. The Balance of Hardships Strongly Favors Plaintiffs

The balance of hardships weighs decisively in Plaintiffs' favor. Without an TRO/PI and an accounting, Jordan and his Entities will completely and permanently obliterate the financial trail necessary for recovery. Plaintiffs' funds, entrusted to Jordan and his Entities for specific purposes, have already been subjected to intentional commingling, incomplete recordkeeping, and misappropriation. *Id.* at ¶103, 109; Chandik Aff. at ¶15. This misconduct, combined with the impending risk of a bankruptcy filing by one or more of Jordan's entities threatens to deprive Plaintiffs of any meaningful opportunity to trace and ultimately recover their funds. The hardship Plaintiffs face includes the loss of their remaining $22 million investment, the inability to trace these funds, and the irreparable harm caused by the erosion of financial transparency necessary to pursue recovery effectively. Jordan and his Entities are in sole possession of the books and records needed to trace where Plaintiffs funds have gone. Thus, Plaintiffs cannot secure this information or protect themselves otherwise.

By contrast, Jordan and his Entities face no significant hardship from complying with the requested TRO/PI. The requested relief merely compels them to freeze assets and payments that are owed to Plaintiffs and provide open and free access to their books and records—both reasonable obligations. Thus, the balance of hardships strongly favors Plaintiffs. The potential loss to Plaintiffs is severe and irreparable, while

the burden on Jordan and his Entities is minimal and consistent with their obligations under the law.[4]

**4. The Public Interest Strongly Favors Injunctive Relief**

Finally, an TRO/PI serves not only to protect Plaintiffs' rights but also to safeguard the broader public from predatory financial schemes orchestrated by habitual offenders like Landon Jordan and his associates. *See, e.g.*, *Suber v. VVP Servs.*, 2021 WL 1101235, at *8 (S.D.N.Y. Mar. 23, 2021) ("Public policy strongly supports the issuance of a temporary restraining order, injunction, and asset freeze where, as is the case here, significant fraudulent activity has been unmasked."); *Allstate Ins. Co. v. Mun*, 751 F.3d 94, 100 (2d Cir. 2014) (holding that "the prevention of insurance fraud for the protection of consumers in New York" is an "important public policy interest").

As detailed in the Complaint, Jordan and his Entities' operation is not an isolated incident but part of a disturbing pattern of fraud and financial manipulation designed to enrich himself at the expense of trusting investors. *Id.* at ¶ 1-9, 44-60. In the Texas and Florida Actions, Jordan's brazen conduct left creditors and victims without recourse, underscoring his willingness to exploit the legal system to evade accountability. *Id.* at ¶ 1-9, 28, 44, 50, 91; *see also* discussion *supra,* Fact Section 1. Allowing Jordan and his

[4] For similar reasons, this Court should find Rule 65(c)'s security requirement waived. *See, e.g.*, *Meisels v. Meisels*, 630 F. Supp. 3d 400, 415 (E.D.N.Y. 2022) ("Plaintiff has shown a substantial likelihood of success on the merits and Defendants have not shown a likelihood of harm were the injunction entered . . . Thus Rule 65(c)'s security requirement is waived."); *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (Where there is "no proof of likelihood of harm" to the non-movant, the court may exercise its discretion to waive the security requirement.").

Entities to continue unchecked would embolden similar misconduct, undermining the integrity of the secondary insurance markets, and the trust investors place in fiduciaries.

## CONCLUSION

An asset freeze and independent accounting is crucial to exposing Jordan and his Entities' fraudulent conduct and safeguarding Plaintiffs' rights. Without it, Plaintiffs face irreparable harm as Jordan and his Entities continue to irreversibly dissipate and conceal assets. This Court's swift action to compel transparency is necessary to ensure accountability and prevent further injustice.

Dated: New York, New York

January 16, 2025

**ROBINS KAPLAN LLP**

By: s/ *Gabriel Berg*
Gabriel Berg
GBerg@RobinsKaplan.com
Eric M. Lindenfeld
ELindenfeld@RobinsKaplan.com
1325 Avenue of the Americas, Suite 2601
New York, New York 10019
Telephone: 212.980.7400

*Attorneys for Plaintiff Pactolus Income Opportunities LLC*

**KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP**

By: s/ *Sean Southard*
Sean Southard

Ssouthard@Klestadt.com
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: 212.972.3000

*Attorneys for Plaintiffs Advanced Plus LLC, Advanced Plus Deal 1 LLC, Advanced Plus Deal 2 LLC*