**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

ADVANCED PLUS LLC, ADVANCED PLUS DEAL 1 LLC, ADVANCED PLUS DEAL 2 LLC, and PACTOLUS INCOME OPPORTUNITIES LLC,

Plaintiffs,

v.

LANDON JORDAN, NATIONAL INDIVIDUAL INSURANCE AGENCY, LLC, BLACKHAWK CLAIMS SERVICE, INC., STRATEGIC LIMITED PARTNERS LP, RFA GROUP, INC., THE HEALTH SHARE GROUP INC., ASSOCIATION HEALTH CARE MANAGEMENT, INC., CRIMSON HOLDING GROUP, INC., RIDGE ADMINISTRATIVE SERVICES, INC., CHRISTOPHER JAMES PAGNANELLI, ROY FRANKLIN ANDING, JR., RAMI HASSAN, MARK KECK, TRACEY BERWICK, DAVID KEELER, and HAROLD L. BROCK, Jr.,

Defendants.

Case No. 24-cv-08881

**AFFIDAVIT OF DAVID CHANDIK**

STATE OF VIRGINA )
) ss.:
COUNTY OF FAIRFAX )

I, David Chandik, being duly sworn, deposes and says:

1. I am over 18 years old and I have personal knowledge of the facts and matters set forth in this Affidavit. I graduated from the University of South Carolina with a Bachelor of Science degree in Business Administration. I have been an Associate

at Pactolus Private Wealth Management, LLC ("Pactolus") since February 2019 and I have authority to make this Affidavit on behalf of Pactolus.

2. I have acted in my capacity as a Pactolus Associate at all times during the events described below. This Affidavit supports Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction to Freeze Certain Assets and Enjoin Certain Defendants from Preventing an Accounting Pursuant to Fed. R. Civ. P. 65.

**A. Background**

3. As detailed in Plaintiffs' Complaint, in May 2023, Advanced Plus LLC ("AP") defaulted on its $32 million obligation to Pactolus Income Opportunities LLC ("PIO") primarily because all $32 million in capital had been deployed to Jordan and Jordan's Entities (as that term is defined in Plaintiffs' Complaint)—and had not been repaid to Plaintiffs by Defendants. Complaint at ¶10. In roughly August 2023, PIO obtained a power of attorney over the AP group of entities to recover as much of the roughly $32 million of PIO's money invested in the Jordan Entities by AP as possible. *Id.* at ¶26.

4. Also, as detailed in Plaintiffs' Complaint, PIO's money had been advanced by AP to the Jordan Entities against insurance agent commissions. *Id.* at ¶61. Insurance agents earn a commission on each insurance policy sold. *Id.* at ¶3. Typically, insurance agents do not receive their commissions until policyholders pay their policy premiums over time, usually monthly. *Id.* Jordan and his employees solicit funds from lenders to retain their insurance agents by advancing several months of future commissions earned by the insurance agents. *Id.* The insurance agents repay their commissions in

order to be paid immediately. Plaintiffs advanced a future revenue stream, which are repaid by the insurance agents. *Id.*

5. In August 2023 until the filing of this action, I met regularly with Landon Jordan's employees: Alex Hartelust, who I understood to be Jordan's Senior Managing Director; Michael Sullivan, who I understood to be Jordan's Chief Operating Officer ("COO"); Corey Hoffman, Jordan's former Chief Financial Officer ("CFO"); and Sam Lin, who became Jordan's new CFO in the Spring of 2024. I refer to Mr. Hartelust, Mr. Sullivan, Mr. Hoffman and Mr. Lin as "Jordan's employees" because I understand that they all serve or served simultaneously in their roles for numerous Jordan Entities.

6. I took over 280 pages of contemporaneous notes of calls, meetings and emails from August 2023 until the filing of this action. Attached to this Affidavit as Exhibits 1 and 2 (they are separated into two pdfs) are true and accurate copies of various pages of the contemporaneous notes that I took in the ordinary course of business during the over one year that I interacted with Defendants on behalf of PIO.

7. I also had been given "view only" access to a portion of the Jordan Entities' online insurance policy reporting system, which never matched what was in the provided weekly funding reports provided by the Jordan Entities. This access was limited, and I never received access to the Jordan Entities' books and records to determine if bank records supported the data that I was provided.

8. The financial irregularities included in the Jordan Entities' books and records—most of which were admitted by Jordan's employees—are too numerous to

detail in this Affidavit. Instead, I have focused on some of the most notable examples, supported by my contemporaneous notes.

9. At the outset, my primary goal had been to reconcile the Jordan Entities' books and records to determine where the advances made by AP, that originated with PIO, had been spent, what remained owed and how it would be repaid. Exhibit 1 at 1. Working with Mr. Hartelust, Mr. Sullivan, Mr. Hoffman, and Mr. Lin, I never was provided sufficient data to answer this fundamental question. It was not just me who could not reconcile the Jordan Entities' books and records. According to Mr. Jordan's own employees, including Mr. Sullivan and Mr. Lin, to this day, the Jordan Entities' books and records are unreconcilable. *See* Exhibit 2 at 113, 125.

**B. Jordan and His Entities' Books and Records Were Incomplete from the Outset**

10. The first call that we had with Mr. Hartelust and Mr. Sullivan was a crash course in document gathering and database access. Ex. 1 at 1. The documents we requested should have been readily available, but Mr. Hartelust and Mr. Sullivan always claimed to need more time, in some instances having to create documents from scratch that normally would be kept in the ordinary course of business. *Id.* at 2.

11. As one example, on a call on August 21, 2023, the extent of the poor financial accounting further revealed itself. Mr. Hartelust and Mr. Hoffman could not account for various payments made by insurance agents to specific lines of Jordon-controlled businesses (called Third Party Administrators) funded by Plaintiffs. This admission was made despite assurances months earlier by Jordan's employees that each Jordan-controlled third party administrator maintained a separate bank account.

12. There were entire lines of Jordan-controlled third-party administrators who had received advances from AP, then further advanced money to agents and agencies with absolutely no documentation at all. When I asked Mr. Sullivan for financial information for proof of the amounts of advances made to a line of business called "The Health Share Group Inc." ("HSG"), he responded that he would look for it and "if it exists" he would ask a Jordan Entity team member to load it into the system. *Id.* at 8. Advances, it turned out, were made to HSG without any contracts at all.

13. On an August 25, 2023, call we discussed a report the Jordan Entities had prepared for AP, before PIO's power of attorney, claiming to track advances made by AP. That report, Mr. Hartelust admitted was "not aligned with funding report process" and Mr. Hartelust claimed to be working with his team "to refresh that report." *Id.* at 9. It was on this call that I made it clear I wanted to reconcile on a monthly go-forward basis once we were on the same page. *Id.* More specifically, I demanded that the reconciliation of Debit Balances be broken down by insurance agent, insurance agency within each line of the Jordon-controlled business. These Jordon-controlled third-party administrators and marketers, include Defendants: National Individual Insurance Agency, LLC, Blackhawk Claims Service, Inc., Strategic Limited Partners LP, RFA Group, Inc., The Health Share Group Inc., Association Health Care Management, Inc., Crimson Holding Group, Inc., and Ridge Administrative Services, Inc. This never happened because Jordan and his Entities were never able to reconcile their books and records.

## C. Commingling and No Corporate Formalities Observed

14. The Jordan Entities' books and records evidence a complete disregard for corporate formalities. Bank accounts commingle funds among the Jordan Entities which received PIO's money. A search of my over 280 pages of notes for the word "segregated" in respect to fees received by the Jordan Entities reveals a request made by PIO over fifteen times for money to be segregated into separate bank accounts and properly recorded on the Jordan Entities' books and records. *See* Exhibit 3. It simply never was done.

15. The most prominent example of commingling of funds was revealed on an April 25, 2024, call. The PIO team, including Alan Harter, PIO' Managing Member representative, Narges Zamani, Pactolus' COO and me, had a call with Mr. Sullivan and Mr. Hartelust. *See* Exhibit 2 at 83-84. Mr. Sullivan revealed that the banks through which AP funded the Jordan Entities needed to be changed because the funds in those accounts were "intertangled with Landon Jordan's personal accounts." *Id.* at 84.

16. In the very next breath, Alan Harter reintroduced the concept of an independent audit by the accountants at BDO—which had been raised systematically. *Id.* Mr. Sullivan recognized the need for the audit, yet it never happened because Jordan and his Entities' books and records were so inaccurate.

## D. Mr. Hoffman is Replaced by Mr. Lin

17. Shortly after learning of the commingling of Mr. Jordan's personal funds with his business accounts, Mr. Hoffman was replaced by Mr. Lin as CFO of the Jordan Entities.

18. On June 14, 2024, AP and PIO had a discussion with Mr. Lin, Mr. Sullivan, Mr. Hartelust and others. My notes detail that Mr. Lin, who had been recently brought in to make sense of the Jordan Entities' books and records said on this call that the "Prior CFO," Mr. Hoffman, "handled things [in] ways he [Mr. Lin] would not have." Exhibit 2 at 113.

**E. The Jordan Entities Debit Balances are Inaccurate and Unreconcilable**

19. For over one year, I have been attempting to reconcile the overall debit balances in the Jordan Entities to track advances made by the Jordan Entities. My notes refer to at least 100 debit balance requests. *See* Exhibit 4. In order for the debit balances to be accurate, Defendants were required to go back in time to reconcile all advances (pre-July 2023). None of Mr. Jordan's employees were ever able to provide us with accurate reconciliation of the debit balances when compared against the data AP had previously been provided. Reconciling the debit balances is critical to repayment of PIO's advances because the Jordan Employees applied repayments made by the insurance agents against their own debit balances, first, without any accurate accounting instead of repaying PIO.

20. I understand that Mr. Jordan directed the Jordan Employees to stop repaying AP until the Jordan Entities' books and records were reconciled. To this day, Mr. Lin admits that he cannot reconcile the Jordan Entities' books and records.

21. Even though I had no access to bank records to validate these debit balances, using the limited information that I did have I analyzed that the Jordan

Entities' attempts to reconcile their books and records are off by at least $1 million—and more importantly, PIO is still owed more than $22 million.

22. From July 3, 2024, through December 29, 2024, and based on the incomplete data provided to me, I am able to calculate that Plaintiffs should have been paid at least $6.5 million that I can see was repaid by brokers to the Jordan Entities, but which Jordan and his Entities did not repay to Plaintiffs.

### F. A Third-Party Administrator Proves a Shortfall of Over $828,000 on the Jordan Entities' Books and Records

23. In December of 2024, PIO began working with a third-party administrator called Premier Health Solutions LLC ("PHS"), with whom the Jordan Entities and AP did a modest amount of business. In reconciling the advances made to PHS by AP, PHS's books and records show $828,000 in remittances sent to the Jordan Entities that are nowhere reconciled on the Weekly Funding from the Jordan Entities given to AP and myself by Jordan-controlled employees. *See* Exhibit 2 at 205. My requests for backup information to prove the accuracy, or here the inaccuracy of the Jordan Entities' books and records, were ignored by Mr. Hartelust. *See id.* (documenting ignored requests).

### G. The Need for an Independent Accounting of Jordan and His Entities

24. Without an independent accounting, Plaintiffs will be left chasing assets transferred or hidden by Defendants, with the financial trail becoming irreversibly hard to track.

25. I believe, but do not know for certain, whether the Jordan Entities keep a centrally located set of books and records for all of their businesses in one physical location in Mansfield, Texas. Any accounting would need to encapsulate all entities—and the physical location of their books and records named as part of this motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**Exhibits**

26. Attached as Exhibit 1 to this affidavit is a true and correct copy of excerpts from David Chandik's contemporaneous call notes involving employees and officers of Plaintiffs and Defendants.

27. Attached as Exhibit 2 to this affidavit is a true and correct copy of excerpts from David Chandik's contemporaneous call notes involving employees and officers of Plaintiffs and Defendants.

28. Attached as Exhibit 3 to this affidavit is a true and correct copy of a screen shot of the results of a search of all of my notes for the partial word "segre," referencing segregated accounts.

29. Attached as Exhibit 4 to this affidavit is a true and correct copy of a screen shot of the results of a search of all of my notes for the words "Debit Balance."

30. Attached as Exhibit 5 to this affidavit is a true and correct copy of a list of the agents and agencies that Plaintiffs know received advances that originated with Plaintiffs. This by no means is a comprehensive list because Defendants' books and records are not reconcilable.

January 15, 2025

By: [signature]
David Chandik

Subscribed and sworn to before me this 01/15/2025

Michael Rios

Notary Public

MICHAEL RIOS
NOTARY PUBLIC
REG. #
8122439
COMMISSION
EXPIRES
SEPTEMBER 30, 2028
COMMONWEALTH OF VIRGINIA